OPINION OF THE COURT
Lorraine S. Miller, J.
The New York State Legislature in 1960 enacted sections 217 and 218 of the General Business Law, clearly “special-interest” protective legislation for retail mercantile establishments where “goods, wares or merchandise are offered to the public for sale” (L 1960, ch 1005, eff June 1,1960). It provided that in any action for false arrest, false imprisonment, unlawful detention, defamation of character, assault, trespass or invasion of civil rights, an authorized agent of the store may detain a person to question the ownership of merchandise as long as the detention is done in a reasonable manner and for a reasonable time and the agency had reasonable grounds to believe that the person detained was committing or attempting to commit larceny on the premises. This protective shield, unique because of its grant to only a segment of our commercial community, i.e., retail mercantile establishments, was designed to stem an acknowledged tide of “shoplifting”; it has also led to *659 many abuses imposed upon innocent shoppers by negligent storekeepers and their ill-trained and often uncaring employees. Wooed and courted by attractive, extensive and costly newspaper, TV and magazine advertising, members of the public are invited and urged daily to enter through the doorways of vast commercial emporiums, deposit earnings and savings for goods, leaving behind a profit for the merchant, and frequently their dignity, pride and health in addition. While “shoplifters” have admittedly proliferated in recent years, unwary legitimate shoppers have also been increasingly ensnared, not by the “reasonable stop” contemplated by section 218 of the General Business Law, but by the careless and cavalier negligence of store personnel, as illustrated by the within case. The special legislation enacted for the unique problems of retail establishments was never intended by the Legislature to confer a license to embarrass, humiliate and harm innocent business invitees and consumers.
Helen Keefe, a 65-year-old diminutive, snow-capped, gentle woman with a background that included three years in a religious order, piano teaching and studies at the New York Art Students League, had been coming to Gimbel’s main store from her New Jersey residence for more than 30 years. She had also been attending the adjacent St. Francis of Assisi Church for approximately the same length of time except for a period when she was hospitalized for a splenectomy after a serious auto mishap.
On January 9, 1981, she responded to an advertisement by defendant offering men’s outerwear, and after buying a hat for herself, she went to the store’s popular lower level. She purchased a corduroy jacket and a down coat for her husband. Payment was made by check and each garment was separately packaged. The receipt was handed to her but not stapled by the store’s employee to the outside of either coat box in contravention of the alleged store policy. When she attempted to leave the store, she testified that red lights began to flash and a “bell like a fire engine” went off, that a red-jacketed man “grabbed her by the arm” that another “tore the boxes out of her hand” and loudly commanded she accompany them; that the boxes were thrown to the floor; that a large crowd gathered, some of whom she *660 knew from her St. Francis Church attendance; that her efforts to display her paid receipt were refused and rejected until it was finally discovered that a large white plastic sensomatic device had been left on one of the coats by the defendant’s employee at the time of her purchase. Both garments were then repacked. Plaintiff was crying and upset and security personnel testified she kept asking, “How could this be happening to me?” Feeling ill and shaken, plaintiff asked for aspirin and was taken to the office of the chief of security from which calls were placed to her family. Apologies (but no aspirins) were offered by Chief Bradley. When she was eventually recomposed, she was accompanied by security personnel to the employees’ exit, and once more, as she attempted to exist, the bells, lights, etc., were activated a second time, again in the presence of numerous people. Another white sensomatic device was found, this time in the pocket of one of the garments she had purchased. Security personnel admitted they laughed at this second occurrence. Chief Bradley testified that similar erroneous “stops” happen 20 times a day (and the “door monitor” estimated 100 erroneous “stops” a week). Bradley also admitted that the store knew that shoplifters frequently detach these devices and place them in pockets of garments still on the racks rather than throw them on the floor or carry them out on their own persons. Yet, despite the knowledge of responsible store executives and alleged instructions to cashiers and packers of this known practice, they had clearly failed to inspect the garments when plaintiff first paid for them, and had again failed to inspect even when the boxes had been opened upon the first wrongful stop of plaintiff. He testified that often “they are too busy.” Both he and defendant’s counsel’s summation admitted they had made “mistakes” in regard to plaintiff, Helen Keefe.
The trial herein extended over a period of several days. At the conclusion of the testimony and summations the court determined, as a matter of law, that defendant was negligent and so advised the jury, predicated upon the admissions by the chief of security and other witnesses, and the summation of defendant’s counsel. The jury thereafter awarded plaintiff $100,000 in compensatory damages for *661 injuries, conscious pain and suffering, and mental anguish that resulted from defendant’s negligence.
The jury was charged that if they found defendant’s acts went beyond ordinary negligence, were so wanton and reckless as to constitute extreme or gross negligence, they might, but were not required, to allow plaintiff exemplary or punitive in addition to compensatory damages. (It was clearly explained to them that if any amount was so awarded by them in the exercise of their sound judgment and discretion it would be to punish the defendant and deter others from similar acts.) Their verdict was $500,000 exemplary damages. Defendant moves herein, pursuant to CPLR 4404 (subd [a]) to set aside the jury’s verdict as to both sums.
The jury also determined there was no assault or battery or wrongful detention. The plaintiff cross' moves herein to set aside that part of the verdict.
At the conclusion of the entire trial, this court stated that the amount of the verdict was excessive and urged parties and counsel to meet and negotiate a mutually acceptable reduced settlement. When their efforts were unsuccessful the court held several postverdict conferences. The plaintiff was both reasonable and realistic citing her age, state of health and the trauma of the trial as motivation for accepting the court’s recommendation of a settlement at a substantially reduced sum from the jury’s verdict of $600,000. The defendant and its carrier remained adamant at $40,000, however (admitting they would prefer to disburse considerable funds for an appeal than give the cost thereof to the plaintiff to resolve the matter).
This court has carefully reviewed many, many cases in which verdicts were declared to be excessive and the pronouncements by several courts that the verdict in a case would be set aside unless the plaintiff agreed to a reduction to a more reasonable sum. The court could find no cases, however, where, as here, the plaintiff acceded to the court’s suggestion of a substantial reduction but the defendant, while admitting its culpability, remained inflexible and intransigent. To set aside the verdict, in toto, under those circumstances and compel this plaintiff to expend further *662 funds to commence an appeal would be compounding the wrong that has already been done to her by this defendant. Ordering an entire new trial would severely prejudice plaintiff for the additional reason that defendant’s employees and counsel will surely never again admit their series of mistakes before a new jury and another Judge, necessitating the purchase by plaintiff of voluminous minutes of the first trial — and a trial on damages only would deprive the new jury of the facts that are intimately interwoven into the damages.
The court denies the defendant’s motion to set aside the jury’s verdict of compensatory damages in the sum of $100,000. There was nothing unconscionable or unfair in light of plaintiff’s uncontradicted testimony of headaches, sleeplessness, incontinence, mental suffering including depression, anxiety, ridicule, embarrassment, and restricted physical, occupational and social activities, etc. Plaintiff had had a serious auto accident sometime prior to the within incident necessitating the removal of her spleen and had been under continuous treatment at a hospital as an outpatient since that time. Her earlier physical problems were exacerbated by the within occurrence. Defendant must “take the plaintiff as he finds her.” In view of all of the foregoing, the compensatory damages were commensurate with the injury done (Varriale v Saratoga Harness Racing, 76 AD2d 991; 7A Warren, NY Negligence [3d ed], pp 13-21).
Clearly the jury found and decided that the admitted negligence of defendant was misconduct which transgressed mere ordinary negligence and constituted a reckless, willful and wanton disregard of both the rights of the plaintiff, to whom it happened twice within a space of an hour, and the public to whom a mistaken “stop” occurs 20 times a day. The defendant was and is duty bound to take appropriate measures to stop the mishandling of customers who unwarily come onto defendant’s premises expecting a pleasant shopping trip but who experience something quite traumatic at least 100 times a week.
When one who operates a retail premises opens his doors to consumers and invites them in to inspect his wares and spend their funds, he has a duty to provide, at the very *663 least, not only a physically safe place, but one in which they will not come to emotional harm, embarrassment, humiliation and mental anguish because of his negligent operation of the premises. Should a legitimate consumer have to assume a risk because there are others on the premises who may be a detriment to the vendor’s business? Must they assume the risk now of being stopped, being physically “pushed around” to the accompaniment of bells and flashing lights, detention and possible arrest simply because the store and its employees are mindful only of the store’s own interests? The law has long required a property owner, a storekeeper, etc., to keep the physical premises in a reasonably safe condition without hidden “traps”. Is this any less a trap? Should a lesser degree of care be required, when it is within the total control of the financially benefited defendant, to prevent harm of this kind to the consumer? It is inconceivable that the Legislature enacted sections 217 and 218 of the General Business Law to confer a “sword” into the hands of negligent mercantile establishments, and it is significant that while the General Business Law enumerates the types of actions in which the defense may be raised, it does not include actions for negligence and/or gross negligence. Expressio unius est exclusio alterius!
The jury herein made a “statement.” By their verdict and the size thereof they issued a warning to the mammoth chains whose wealth they were entitled to consider that they deemed it an affront to invite this plaintiff in and then inflict such oppressive conduct upon her by the reckless and admittedly negligent conduct of employees who were “too busy.” The court construes their verdict as one designed to prevent similar injurious impact to other consumers at large and as a deterrent to defendant and other stores who daily engage in the same offensive conduct resulting from a system they have authorized, initiated, adopted and installed for their benefit without regard for the innocent who are negligently brought into the net they have woven (Brink’s, Inc. v City of New York, 546 F Supp 403; Reynolds v Pegler, 123 F Supp 36, 39, affd 223 F2d 429, cert den 350 US 846; Garrity v Lyle Stuart, Inc., 40 NY2d 354). While it might be said by some that the *664 amount of the verdict herein indicates prejudice or passion against the defendant by members of the public sitting on this jury, the court sees this instead as a pointed expression by the community which has a right to rebuke the defendant for its system by way of punitive damages to insure the protection of the innocent (Stevens v O’Neill, 51 App Div 364, affd 169 NY 375). The wealth and resources of a defendant are appropriate considerations for a jury in determining the amount of punitive damages, for what would be a punishment to the “mom and pop” corner grocery store would scarcely be a deterrent for the affluent multistore chain such as the defendant herein. As one court reasons, “Would we deter the commission of malicious acts by the wealthy if they were punished the same as the poor?” (Chilvers v New York Mag. Co., 114 Misc 2d 996, 997.) Would we deter reckless conduct or conduct that evidenced a sheer disregard for a consumer plaintiff’s rights without making the aforesaid distinction? This court and others have held that a defendant’s financial status is surely a factor in determining a punitive damage award (Chilvers v New York Mag. Co., supra; Rupert v Sellers, 48 AD2d 265). The court should not substitute its judgment for that of the jury but is bound to view the evidence in the light most favorable to the prevailing party and to give it the benefit of all inferences which the evidence fairly supports. Precise ascertainment of damages is not always possible with regard to a defendant’s tortious conduct (Randall-Smith, Inc. v 43rd St. Estates Corp., 17 NY2d 99). A just and reasonable estimate by a jury sitting in a quasi-judicial capacity must suffice and they are vested with a broad discretion in assessing punitive damages (Brink’s, Inc. v City of New York, supra, p 413; Reynolds v Pegler, supra, p 39).
There is no yardstick in measuring what amount will deter repetition of grossly negligent acts and lack of supervision as in the instant case. Cases speak of an award being excessive that “shocks the conscience” of the court — or an award that results from “passion [or] prejudice” (Juiditta v Bethlehem Steel Corp., 75 AD2d 126, 138; Petosa v City of New York, 63 AD2d 1016, 1017). This court believes that the criteria should be what amount will “smart” or “pinch” *665 the defendant sufficiently, and others in the same business or similarly situated, to motivate more careful training and supervision of employees, the hiring of more employees to properly handle the volume of work without being “too busy” to remove the tags and search for those already illicitly removed. In short, a relation to reality is required as long as it is consonant with the jury’s intention (Reinah Dev. Corp. v Kaaterskill Hotel Corp., 86 AD2d 50), since the trial court is in the best position to evaluate the reactions of the jury (Hogue v Wilson, 51 AD2d 424).
As Mr. Justice Kassal, formerly of this court, once said: “Regarding the amount of such punitive damages the jury has determined what it feels will set an example and establish guidelines to avoid recurrence. The jury, as such, represents the voice of the community and it is not the province of the Trial Judge to substitute his judgment for the jury’s unless it is so excessive as to shock the conscience of the court” (Da Costa v Technico Constr. Corp., 74 Misc 2d 583, 585):
The court determines that punitive damages in the sum of $75,000 will serve as a sufficient deterrent to prevent repetition by the within defendant and others similarly situated, and will encourage better training and supervision of employees and the hiring of more employees, if necessary, to accord innocent shoppers the care and courtesy they are entitled to. It may also motivate the introduction of a better system that will not entrap the innocent consumer.
Accordingly, the motion to set aside the verdict of $600,000 herein is granted unless plaintiff files a written stipulation agreeing to the reduction of the verdict herein to the total sum of $175,000 (representing compensatory damages of $100,000 and punitive damages of $75,000) within 15 days from the filing of this decision, in which event a judgment for the reduced amount may be entered by the plaintiff. Should the defendant thereafter decide to pursue an appeal from this decision and the aforesaid reduced sum, the court also determines that the plaintiff’s cross motion re causes of action for assault, battery and *666 wrongful detention should be and they hereby are reinstated so that all causes of action may be before any reviewing court.