SOFTEL, INC., Plaintiff,

v.

DRAGON MEDICAL AND SCIENTIFIC COMMUNICATIONS LTD., Dragon Medical and Scientific Communications, Inc., John R. Darsee, H. Eugene Hodge, Nina Romanoff, Hoffman Laroche, Inc., Pfizer, Inc., and Pfizer Pharmaceuticals, Inc., Defendants.

No. 87 Civ. 0167 (MGC).

United States District Court, S.D. New York.

July 7, 1995.

Brown & Seymour by Whitney North Seymour, Jr., Craig A. Landy, Charla R. Bikman, New York City, for plaintiff.

Stroock & Stroock & Lavan by Bruce H. Schneider, Gordon Kessler, Jaffe & Asher by William A. Rome, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

CEDARBAUM, District Judge.

Softel, Inc. ("Softel"), a company that develops and sells computer graphics products, sues Dragon Medical and Scientific Communications, Inc. ("Dragon") and some of Dragon's employees for copyright and trademark infringement, misuse of trade secrets and unfair competition.[1] From April 23, 1991 to May 13, 1991, Judge Cannella held a bench trial limited to liability issues, in which he found defendants Dragon and John Darsee[2] liable for copyright infringement and misuse of trade secrets, and found that the misuse of trade secrets was willful and in bad faith, entitling plaintiff to punitive damages. *See Softel, Inc. v. Dragon Medical & Scientific Communications, Inc.*, No. 87 Civ. 0167 (JMC), 1992 WL 168190 (S.D.N.Y. June 29, 1992) [hereinafter "*Softel I*"]. Familiarity is assumed with Judge Cannella's decision which is the law of this case.

From May 8, 1995 to May 11, 1995, I held a bench trial to determine the amount of damages for which defendants are liable. After examining the documents, observing

---

1. Although Dragon Medical and Scientific Communications, Ltd. is named as a party in the caption, no entity has ever existed under that name.

2. Judge Cannella granted judgment as a matter of law to defendants Hodge and Romanoff at the conclusion of plaintiff's case. The Pfizer defendants and defendant Hoffman Laroche settled with plaintiff before trial.

the demeanor of the witnesses, and considering the plausibility and credibility of their testimony, I make the following findings of fact and conclusions of law.

### Findings of Fact

#### The Parties

1. Plaintiff Softel is a New Hampshire corporation engaged in the business of developing and selling computer graphics products to users of IBM compatible computers. Paul Fiondella is the president and sole shareholder of Softel. (*Softel I*, Findings of Fact ("F.F.") ¶ 1.)

2. Defendant Dragon was a New Jersey corporation engaged in the business of designing interactive computer programs to present medical and scientific information until it ceased doing business on January 31, 1992. (*See Softel I*, F.F. ¶ 2; Tr. at 380.)

3. Defendant John R. Darsee was a medical writer for Dragon and the director of its interactive department. (*Softel I*, F.F. ¶ 6.)

#### Background Facts Regarding Liability

4. In November 1984, Darsee purchased Videogram 2.0, a "paint-and-draw" computer graphics program, from Softel. (*Softel I*, F.F. ¶¶ 15, 17, 21.) Videogram 2.0 did not enable the user to incorporate images drawn with it into software the user was writing. (*Softel I*, F.F. ¶ 17.)

5. In January 1985 through June 1985, Dragon hired Fiondella to write code that would display graphics images created in Videogram 2.0 in several of Dragon's interactive programs (the "image retrieval routines"). (*Softel I*, F.F. ¶¶ 26–66, 75.)

6. Fiondella never gave Dragon the source code he had written. Rather he gave Dragon only the "executable" object code. (*Softel I*, F.F. ¶¶ 28, 44, 51, 60, 75.)

7. Darsee somehow gained access to Softel's source code and used the code to retrieve and display graphics images in two Dragon interactive programs, Hairy Cell Roche and Low Back Pain. (*Softel I*, F.F. ¶¶ 62, 65, 70.)

8. On May 22, 1986, plaintiff sought to register a copyright for certain computer code (the "Copyright Collection"). Plaintiff sought to register the following: (1) a program entitled "SHOWPIX.bas," which includes code similar to that of certain image retrieval routines; (2) a collection of object code routines called "8068/8 Support Routines," which includes the five assembly code routines used to retrieve and display Videogram images; and (3) source code for one of the projects plaintiff did for Dragon. Plaintiff was granted a Certificate of Copyright, Registration No. TXu 236 931, for the Copyright Collection, effective May 22, 1986. (*Softel I*, F.F. ¶ 77; Plaintiff's Liability Trial Exhibit ("PLX") 34.)

9. In 1988, Dragon utilized a different paint-and-draw program (called "Dr. Halo") instead of plaintiff's Videogram software in producing several interactive programs. (*Softel I*, F.F. ¶¶ 101–103.) Because the images used in those programs were stored in a different format for use with a different type of graphics card, those programs did not use the image retrieval routines. (*Softel I*, F.F. ¶ 103.) The programs Dragon produced in 1988 were not in any way derived from Softel's copyrighted work. (*Softel I*, F.F. ¶ 115.)

#### Plaintiff's Lost Profits Due to Defendants' Use of Image Retrieval Routines

10. Defendants presented evidence that plaintiff charged a license fee of $2,000 for the use of the image retrieval routines in another program and that plaintiff offered Dragon a contract, which Dragon refused, pursuant to which Dragon would have paid plaintiff $3,500 per computer program to license code previously developed by plaintiff. (Tr. at 292–99; PLX 63, 66.)

11. Evidence was also presented that Dragon paid license fees on two occasions to Media Cybernetics for the use of code similar to that of the image retrieval routines in connection with images created in the Dr. Halo paint-and-draw program. (Tr. at 598–606.) In 1987, Dragon paid Media Cybernetics $10,000 for a license to use code that retrieved graphics images in ten Dragon software packages. (Plaintiff's Damage Trial Exhibit ("PDX") D–18.) In 1989, Dragon paid Media Cybernetics $8,200 for a license to use such code in an unlimited number of programs. (Tr. at 598.)

12. Evidence was presented at trial that a license for the use of source code may be substantially more expensive than a license for the use of the executable code. For example, plaintiff's expert testified that he obtained a license to use the source code of the UNIX operating system for $43,000, but an executable copy of the software was available for $600. (Tr. at 60.) This license did not allow the user to incorporate the UNIX software into its own products. (Tr. at 61.) No evidence was presented as to how much a source code license would cost for a program that performed functions similar to those of the image retrieval routines.

13. Based on the evidence presented at trial, I find that plaintiff's lost profits are $7,000, that is, the amount plaintiff would have charged defendants under its proposed agreement for the use of the image retrieval routines in two programs. Although a source code license fee might have been considerably higher, I find that it is unlikely that Dragon would have paid such a high fee considering the availability of other programs which performed the same functions as the Videogram image retrieval routines. (*See* Defendants' Damage Trial Exhibits ("DDX") AT & AU; Tr. at 587–615.) Dragon used plaintiff's source code only to produce the Hairy Cell and Low Back Pain programs. It did not use the source code for any other purpose. Essentially, the value to Dragon of the use of plaintiff's code was the saving of the license fee it would have paid to plaintiff for the use of the image retrieval routines.

*Dragon's Profits from Programs Utilizing Infringing/Misappropriated Code*

14. Dragon's gross revenue from the Hairy Cell Roche program was $92,500. (DDX A; PDX D–2.) Dragon's gross revenue from the Low Back Pain program was $85,415.32. (DDX B; PDX D–2.)

15. Dragon incurred direct costs of $39,108.96 for the production of the Hairy Cell Roche program and $32,630.36 for the pro-

duction of the Low Back Pain program. (DDX A & B.)[3] These costs included expenses for video copying and editing, audio recording, equipment rental, freelance graphic artists, a background music composer and actors. (Tr. at 391–93.)

16. In addition to out-of-pocket expenses, Dragon incurred direct labor costs of $31,001.00, indirect labor costs of $261.07 and overhead expenses of $11,616.00 in connection with the production of Hairy Cell Roche, and direct labor costs of $7,156.38, indirect labor costs of $1,112.27 and overhead expenses of $2,968.05 in connection with Low Back Pain. (PDX D–2.) Direct labor was computed on an employee-by-employee basis as an allocation of each employee's salary based on hours worked on a project as a percentage of his or her total hours worked on all projects. (Tr. at 394.) Indirect labor costs were computed by allocating year-end employee bonuses based upon the direct labor allocation. (*Id.*) Overhead expenses were also allocated to each project based on the direct labor expended on that project. (*Id.*) Overhead expenses included only the portion of rent, maintenance and utilities associated with production and did not include the portion of those expenses associated with administration. (Tr. at 395–96.)

17. Dragon also received $31,800.02 in revenues by providing "exhibit support" when the Hairy Cell program was shown at some exhibitions. (PDX D–2; Tr. at 400.) The expenses associated with the exhibit support were $25,676.17 in direct costs, $1,402.89 in direct labor, $251.76 in indirect labor and $769.88 in overhead. (PDX D–2.)

18. The computer code of Softel's image retrieval routines comprises a relatively small portion of the total number of lines and memory (measured in bytes) in the Hairy Cell and Low Back Pain programs. Softel's code comprises 15.8% of the lines and 6.1% of the bytes in the Low Back Pain program and comprises 7.8% of the bytes in the Hairy Cell program.[4] (Tr. at 566, 571, 577–78; DDX

---

3. PDX D–2 lists the direct costs for the Low Back Pain program as $33,472.36. Because defendants have the burden of showing the costs that should be taken into account in assessing dam-

ages, see C.L. ¶ 1 *infra,* I will use the lesser amount shown in DDX B.

4. Defendants' expert was unable to determine the percentage of lines of Softel code in the

AP–1, AP–2, AR.) If one considers only the portions of Softel's code actually called and used in the program, those percentages are further reduced. (Tr. at 571, 576–77; DDX AP–1, AP–2, AR.)

19. In determining the portion of profits attributable to the image retrieval routines, it is necessary to examine not only the quantity of the infringed code in relation to the entire program, but also the qualitative importance of that code. *See Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 775 F.Supp. 544, 571–72 (E.D.N.Y.1991), *aff'd in part, vacated in part,* 982 F.2d 693 (2d Cir.1992). Although defendants presented evidence that plaintiff's image retrieval routines comprised only a small part of the Hairy Cell Roche and Low Back Pain programs, that evidence is not wholly determinative of the contribution the image retrieval routines made to the program.

20. Because the routines made it possible to show quickly graphics images on the screen, they were an integral part of the Hairy Cell Roche and Low Back Pain interactive computer programs. (Tr. at 28–29, 156, 490–91.)

21. Dragon's sales of these programs are attributable not only to the use of the graphics images, but also to the overall design and the subject matter of the presentation, which were developed entirely by Dragon. (Tr. at 349, 446–47, 450–51, 493–96.) In addition, some of the images used in Hairy Cell were brought up to the screen from videodisc, and some graphics images used in Low Back Pain were in Dr. Halo format. (Tr. at 445–46, 455–56; DDX M.) The display of these images did not employ the image retrieval routines. (Tr. at 450, 455–56, 492.)

22. Taking all of these factors into account, I find that 50 percent of Dragon's profits from the Hairy Cell and Low Back Pain programs are attributable to plaintiff's image retrieval routines.

*Dragon's Financial Condition*

23. In the fiscal year ending January 31, 1987, Dragon's Net Income was $58,798. (DDX J.)

24. Dragon ceased doing business on January 31, 1992 after its board of directors decided to dissolve the company. (Tr. at 380; PDX D–4.)

25. As of May 10, 1995, Dragon had collected all debts owed to it, and had outstanding expenses of $550 per three-month period and deferred compensation owed to Darsee and Eugene Hodge, Dragon's president. (Tr. at 405–06, 411.)

26. As of May 10, 1995, Dragon had two bank accounts with a combined balance of $16,187.26. (Tr. at 406–07; DDX AX & AY.)

*Darsee's Financial Condition*

27. Dragon paid Darsee $69,249.98 in salary and bonus in 1986 and $72,000 in 1987.

28. Darsee is currently employed by Scientific Information Systems ("SIS"), a company that designs and produces programs that communicate product information or education. (Tr. at 478–80.) The shares of SIS are owned by Darsee's wife, his oldest daughter, and one other person. (Tr. at 486.)

29. In 1993, SIS paid a salary of $20,500 to Darsee and a salary of $83,000 to Darsee's wife. (DDX Y–9.) In 1993, Darsee was also paid $70,250 by Cypress Scientific Pres., Inc. and his wife was paid $61,745 by Hackensack Medical Center. (*Id.*) Darsee has not yet filed an income tax return for 1994. (Tr. at 479; DDX Y–10.)

30. Darsee's assets are the following: a checking account with a balance of between $4,000 and $6,000, a term life insurance policy, a retirement account worth approximately $31,000, and a joint tenancy interest in the house that his wife bought in 1985. (Tr. at 479.) The house was valued at $248,000 in 1991, and was subject to mortgages totalling $169,841 as of June, 1993. (Tr. at 476–77.) Darsee was made a joint tenant in 1989 when he and his wife decided to refinance their mortgage and the bank conditioned the refinancing upon the deed being in both of their names. (Tr. at 475.)

31. Darsee's mortgage payments are approximately $2,000 per month. (Tr. at 480.) Monthly payments on his car lease are $300.

Hairy Cell program because he did not have the source code to that program. (Tr. at 575.)

(Tr. at 481.) Darsee and his wife provide for three children, aged 23, 16 and 6. (Tr. at 471–72.) This year they paid the costs of their oldest child's master degree in education at Fordham University, which amounted to $19,000, and leased a car for her commute to and from school. (Tr. at 481.) Darsee's 16–year–old child has Down's Syndrome, and Darsee and his wife incur additional expenses associated with that child's special health and educational needs. (Tr. at 482–85.)

32. Darsee does not have any indemnification agreement with Dragon. (Tr. at 433.)

*Conclusions of Law*
*Copyright Damages*

1. Section 504(b) of the Copyright Act provides:

> **Actual Damages and Profits.**—The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

■ 2. Plaintiff argues that its actual damages are its costs of developing the image retrieval routines. The only case plaintiff cites in support of the proposition that development costs are an appropriate measure of copyright damages is *Harris Market Research v. Marshall Marketing and Communications, Inc.*, 948 F.2d 1518, 1524 (10th Cir.1991). In that case, the Tenth Circuit held that it was not reversible error for the trial court to have admitted evidence on plaintiff's development costs where the court gave a jury instruction, to which defendant did not object, that copyright infringement damages may include plaintiff's unrecovered costs. That case is not persuasive authority for the thesis that the plaintiff in this case is entitled to its development costs as part of its actual damages.

3. Although there may be situations in which it is appropriate for a plaintiff who is successful on a copyright infringement claim to recover development costs as part of its actual damages, the facts of this case do not present such a situation. Defendants' use of plaintiff's copyrighted computer code did not prevent plaintiff from profiting from use of the code except to the limited extent of preventing plaintiff from receiving license fees from Dragon. (*See Softel I*, Conclusions of Law ("C.L.") ¶ 21.) In fact, plaintiff used some of the code contained in the image retrieval routines in other programs it sold. (Tr. at 172–75.) Therefore, plaintiff's costs in developing the image retrieval routines cannot be considered an "unrecovered cost." Plaintiff did not present evidence that any of the image retrieval routines was developed specifically for Dragon and was not marketable to others.

■ 4. Plaintiff's actual damages from the copyright infringement are the profits it lost as a result of defendants' infringement. In this case, plaintiff's losses are measured by the royalty payments it would have received from defendants for the use of the source code for the image retrieval routines, or $7,000. *See* Findings of Fact ¶ 13, *supra.*

5. In addition to lost profits, plaintiff is entitled to recover defendants' profits earned as a result of the infringement.

■ 6. Plaintiff urges that because Judge Cannella determined that the infringement was willful, defendants should not be able to deduct any expenses in calculating profits. Plaintiff's view is supported by neither a plain reading of the Copyright Act nor decisions in this Circuit. *See Sheldon v. Metro–Goldwyn Pictures Corp.*, 106 F.2d 45 (2d Cir.1939), *aff'd*, 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940); *Warner Bros., Inc. v. Gay Toys, Inc.*, 598 F.Supp. 424 (S.D.N.Y.1984); *RSO Records, Inc. v. Peri*, 596 F.Supp. 849 (S.D.N.Y.1984).

7. Courts have allowed the deduction of a variety of expenses, including an allocation of fixed cost overhead expenses associated with the production of an infringing product. *See In Design v. K–Mart Apparel Corp.*, 13 F.3d

559, 565–66 (2d Cir.1994); *Sheldon,* 106 F.2d at 54; *Warner Bros.,* 598 F.Supp. at 428–29. Plaintiff did not challenge the validity or method of computation of any of Dragon's claimed expenses. (*See* Tr. at 389.) Therefore, because defendants have offered a fair and reasonable formula for determining allocation of fixed costs such as overhead and salaries, they are entitled to the deduction of the amounts claimed as expenses from gross revenues in computing profits under Section 504(b).

■ 8. Plaintiff correctly notes that an increase in defendants' good will resulting from their infringement may be considered a "profit" for which the plaintiff is entitled to damages under Section 504(b). *See Business Trends Analysts, Inc. v. Freedonia Group, Inc.,* 887 F.2d 399, 404 (2d Cir.1989). However, plaintiff did not present evidence supporting its contention that defendants' good will was enhanced as a result of their infringement of plaintiff's image retrieval routines. Darsee testified at trial that he had not shown the Hairy Cell program to any prospective clients. (Tr. at 502.) Although Darsee did show the Hairy Cell program at a meeting of the International Interactive Computer Society in November 1986 (*Softel I,* F.F. ¶ 72), plaintiff did not present any evidence that Dragon obtained new customers or increased its good will with existing customers as a result of that demonstration. (*See also Softel I,* F.F. ¶ 98.)

*Trade Secret Damages*

■ 9. Damages for misappropriation of a trade secret may be measured by either plaintiff's losses or the profits or other benefits gained by defendants through the use of the trade secret. *See A.F.A. Tours, Inc. v. Whitchurch,* 937 F.2d 82, 87 (2d Cir.1991); *Timely Prods. Corp. v. Arron,* 523 F.2d 288, 304 (2d Cir.1975); *A.H. Emery Co. v. Marcan Prods. Corp.,* 268 F.Supp. 289, 302 (S.D.N.Y.1967), *aff'd,* 389 F.2d 11 (2d Cir.), *cert. denied* 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106 (1968); *Ewen v. Gerofsky,* 86

Misc.2d 913, 382 N.Y.S.2d 651, 655 (Sup.Ct. N.Y.Cty.1976); 3 Roger M. Milgram, Milgram on Trade Secrets § 15.02[3][c] (1994).

■ 10. Another method of computing damages for trade secret misappropriation is the assessment of a reasonable royalty for the use of the trade secret. *See University Computing Co. v. Lykes–Youngstown Corp.,* 504 F.2d 518, 536 (5th Cir.1974); *Vitro Corp. v. Hall Chemical Co.,* 292 F.2d 678, 681–83 (6th Cir.1961); 3 Milgram on Trade Secrets § 15.02[3][e]. Both plaintiff and defendants suggest in their pre-trial briefs that a "reasonable royalty" or license fee determination might be an appropriate measure of damages. (*See* Plaintiff's Trial Mem. on Damages, at 18–19; Defendant's Mem. in Opp. to Plaintiff's Mot. for Summ. J., at 17.)

■ 11. Plaintiff contends that the measure of damages should be the costs of developing the program times a multiplier which takes into account the probable return on the investment in product development. Plaintiff cites *University Computing* in support of its method of computation. In *University Computing,* however, the court did not apply such a measure. It did discuss the various methods of measuring damages for trade secret misappropriation and noted that development costs are a factor to be considered in determining what would have been a reasonable royalty for the use of a misappropriated trade secret. *University Computing,* 504 F.2d at 538. The court noted that the application of the "reasonable royalty" measure of damages in lieu of the usual approach of measuring damages by defendants' profits was appropriate where defendants made no profits from the misappropriation. *Id.* at 536. If defendants had made a profit, the court indicated that it would have measured damages by the profits gained by defendants through the use of plaintiff's trade secret. *Id.*

12. The appropriate measure to use in computing trade secret damages in this case is the amount of defendants' profits.[5]

---

**5.** This measure results in a larger recovery for plaintiff than the reasonable royalty method since that measure would be essentially the same as the lost profits measure conducted for the

copyright infringement damages. At any rate, the measure used makes little difference, since plaintiff cannot receive a double recovery when the damages are coextensive. *See Computer As-*

13. In computing defendants' profits from the trade secret misappropriation, defendants are entitled to set off the costs associated with the production of the product that incorporates the misappropriated trade secret. *See Elnicky Enterprises v. Spotlight Presents, Inc.*, 213 U.S.P.Q. 855, 863 (S.D.N.Y.1981), *accounting settled*, 213 U.S.P.Q. 955 (S.D.N.Y.1982); *David Fox & Sons, Inc. v. King Poultry Co.*, 30 A.D.2d 789, 292 N.Y.S.2d 21, 23 (1st Dep't 1968) (unfair competition).

14. In measuring defendants' profits, it is also appropriate to apportion damages based on the role plaintiff's trade secret played in the commercial success of defendants' product. *See University Computing*, 504 F.2d at 539.

15. Plaintiff argues that it should be awarded damages based on the competitive advantage gained by Dragon in being able to market its interactive programs with graphics displays earlier than competitors. Although such gains could be brought into the calculation of damages, plaintiff did not prove that Dragon gained any time advantage over competitors. Dragon's expert on computer graphics programs testified that other graphics software was available at the time that Dragon developed the Hairy Cell and Low Back Pain programs which allowed users to incorporate images made with a paint-and-draw program into the users' own programs. (Tr. at 583–609.) Plaintiff did not proffer any contradictory testimony as to the availability of programs with functionality similar to that of the Videogram image retrieval routines.

16. Therefore, the compensatory damages based on defendants' profits earned from the misappropriation of plaintiff's trade secret are the same amount as those awarded for defendants' profits gained from copyright infringement.

17. Because defendants' profits from copyright infringement and trade secret misappropriation are coextensive in this case, plaintiff is entitled to only one recovery of defendants' profits. *See Computer Assocs. socs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 720

*Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 720 (2d Cir.1992).

*Prejudgment Interest*

18. Prejudgment interest with respect to the trade secret misappropriation claim is determined by New York law. N.Y.Civ. Prac.L. & R. § 5001(a) provides:

> Interest shall be recovered upon a sum awarded ... because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.

19. Plaintiff and defendants agree that trade secret misappropriation is "an act ... interfering with title to, or possession or enjoyment of, property," and, is therefore, within Section 5001(a). (*See* Defendants' Post–Trial Proposed Findings of Fact and Conclusions of Law Regarding Damages ¶ 163; Plaintiff's Trial Mem. on Damages, at 28.)

20. Defendants argue that because disgorgement of profits is an equitable remedy, the court has discretion whether to award prejudgment interest. However, where "[t]he cause of action and damages requested are essentially legal in nature, ... the court must apply the statutory rate of interest." *Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 508–09 (2d Cir.1991). Because plaintiff's claim for damages for trade secret misappropriation is essentially legal in nature, prejudgment interest on the trade secret damages must be awarded pursuant to Section 5001(a). Even if the claim were held to be equitable, I would exercise my discretion to grant prejudgment interest in this case.

21. The issue of the permissibility of prejudgment interest under the current Copyright Act, which neither expressly allows nor prohibits such an award, is unresolved in the Second Circuit. *In Design v. K–Mart Apparel Corp.*, 13 F.3d 559, 569 (2d Cir.1994). If such an award is permitted, the award of prejudgment interest is discretionary. *Id.* (2d Cir.1992).

22. In the exercise of my discretion, I award plaintiff prejudgment interest on the lost profits portion of the copyright infringement damages because prejudgment interest on lost profits compensates plaintiff for loss of the use of those funds. *See United States Naval Inst. v. Charter Communications, Inc.,* 17 U.S.P.Q.2d 1063, 1067, 1990 WL 104027 (S.D.N.Y.1990) (awarding prejudgment interest on portion of award representing plaintiff's lost profits, but not on portion of award representing defendant's profits from infringement), *aff'd in part, rev'd in part,* 936 F.2d 692 (2d Cir.1991); *see also Bourne Co. v. Walt Disney Co.,* 31 U.S.P.Q.2d 1858, 1860–61, 1994 WL 263482 (S.D.N.Y.1994) (awarding prejudgment interest on stipulated damages settlement).

23. N.Y.Civ.Prac.L. & R. § 5001(b) provides:

> Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

24. A claim exists for trade secret misappropriation when (1) defendants possessed a trade secret, and (2) defendants used that trade secret in breach of an agreement, confidence, duty, or as a result of discovery by improper means. (*Softel I,* C.L. ¶ 41.)

25. Plaintiff urges that interest should be computed from the date upon which Darsee first gained access to the source code of the image retrieval routines. However, the cause of action did not exist until defendants both possessed the code and *used* it. Therefore, interest should be computed from the dates upon which plaintiff's code was incorporated into defendants' programs. Because neither side presented evidence as to when Darsee incorporated plaintiff's code, the earliest ascertainable dates of the existence of the cause of action are the dates upon which the programs were completed. The Hairy Cell program was completed on March 10, 1986, and the Low Back Pain program was completed on May 23, 1986. (*Softel I,* F.F. ¶¶ 72, 74.) Therefore, interest on damages arising from the Hairy Cell program should be computed from March 10, 1986 and interest on damages arising from the Low Back Pain program should be computed from May 23, 1986. For ease of calculation, all damages will be calculated from April 14, 1986, the midpoint between these two dates. *See* N.Y.Civ.Prac.L. & R. § 5001(b); *Computer Assocs.,* 775 F.Supp. at 572.

26. The annual rate of interest on the compensatory damages for trade secret misappropriation is nine percent. *See* N.Y.Civ. Prac.L. & R. § 5004.

[16] 27. There is no federal statutory rate for prejudgment interest. Federal courts have applied various rates of prejudgment interest on federal claims. *See Hollie v. Korean Air Lines Co.,* 834 F.Supp. 65, 69 (S.D.N.Y.1993) (citing decisions in which various rates have been applied). The rate applied should be calculated to compensate the plaintiff for the loss of use of the funds during the time in question. *See Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 286 (2d Cir.1992) (prejudgment interest on ERISA award should reflect what plan would have earned if it had had the funds it lost due to breach of fiduciary duty); *In the Matter of Complaint of Connecticut Nat'l Bank,* 928 F.2d 39, 47 (2d Cir.1991) (in determining prejudgment interest rate on award under Death on the High Seas Act, district court should consider inflation and interest rate plaintiff would have received on relatively risk free investments); *E.E.O.C. v. County of Erie,* 751 F.2d 79, 82 (2d Cir.1984) (prejudgment interest on award under Fair Labor Standards Act and Equal Pay Act at adjusted prime rate upheld as proper exercise of discretion where such rate "has been adopted as a good indicator of the value of the use of money"). The appropriate rate to be applied to the damages for copyright infringement is the average 52–week Treasury bill rate compounded annually. *See Hollie,* 834 F.Supp. at 71; *see also Bourne Co. v.*

*Walt Disney Co.,* 31 U.S.P.Q.2d 1858, 1861, 1994 WL 263482 (S.D.N.Y.1994).

28. Although the trade secret misappropriation compensatory damages overlap with the portion of the copyright infringement damages which represent defendants' lost profits, plaintiff is entitled to only one payment of prejudgment interest on each part of the compensatory damages award. Therefore, plaintiff is entitled to prejudgment interest calculated at the rate of nine percent on the trade secret misappropriation damages (defendants' profits) and prejudgment interest calculated at the annual average 52–week T-bill rate on the copyright infringement damages which do not overlap with the trade secret misappropriation damages (plaintiff's lost profits).

*Punitive Damages*

29. Judge Cannella found that defendants' conduct was willful and in bad faith to such a degree that plaintiff was entitled to receive punitive damages. (*Softel I,* C.L. ¶¶ 59–60.)

30. There is no formula by which the finder of fact must determine punitive damages. *Yokley v. Henry–Clark Assocs.,* 164 Misc.2d 177, 624 N.Y.S.2d 341, 343 (Civ. Ct.Kings Cty.1995); *Deborah S. v. Diorio,* 153 Misc.2d 708, 583 N.Y.S.2d 872, 875 (Civ. Ct.N.Y.Cty.1992); N.Y. P.J.I. 2:278. The amount fixed need bear no particular relationship to the amount awarded as compensatory damages. *Hartford Accident and Indemnity Co. v. Village of Hempstead,* 48 N.Y.2d 218, 422 N.Y.S.2d 47, 53 n. 15, 397 N.E.2d 737, 743 n. 15 (1979); *Yokley,* 624 N.Y.S.2d at 343; N.Y. P.J.I. 2:278.

31. However, punitive damages should bear a reasonable relationship to the wrong committed. *See Chlystun v. Kent,* 185 A.D.2d 525, 586 N.Y.S.2d 410, 412 (3d Dep't 1992); *Manolas v. 303 West 42nd Street Enterprises,* 173 A.D.2d 316, 569 N.Y.S.2d 701, 702 (1st Dep't) (setting aside jury award of punitive damages that was 80 times that awarded for compensatory damages), *appeal denied,* 78 N.Y.2d 864, 578 N.Y.S.2d 879, 586 N.E.2d 62 (1991); *Yokley,* 624 N.Y.S.2d at 343 (reducing jury's award of punitive damages against landlord where award exceeded value of building and "vastly exceed[ed] any benefit the defendant could possibly have derived from its wrongful conduct").

32. Because the object of punitive damages is to punish the defendant, it is appropriate for the trier of fact to consider the defendant's financial circumstances in determining the amount of punitive damages. *Rupert v. Sellers,* 48 A.D.2d 265, 368 N.Y.S.2d 904, 913 (4th Dep't 1975); *Chilvers v. New York Magazine Co.,* 114 Misc.2d 996, 453 N.Y.S.2d 153, 154 (Sup.Ct.N.Y.Cty.1982); *see also Hartford Accident & Indemnity,* 422 N.Y.S.2d at 53, 397 N.E.2d at 743 (noting that allowing insurance coverage for punitive damage awards would conflict with "the rule permitting the jury to consider defendant's financial standing in fixing the amount of punitive damages").

33. Plaintiff urged at trial that although it might be appropriate to consider an individual's financial circumstances in assessing punitive damages, it would not be appropriate to consider a corporate defendant's financial situation. (Tr. at 373–74.) Plaintiff's position is not supported by the decisions of the courts of New York. *See Thoreson v. Penthouse Int'l, Ltd.,* 149 Misc.2d 150, 563 N.Y.S.2d 968, 976–77 (Sup.Ct.N.Y.Cty. 1990), *aff'd as modified,* 179 A.D.2d 29, 583 N.Y.S.2d 213 (1st Dep't), *aff'd,* 80 N.Y.2d 490, 591 N.Y.S.2d 978, 606 N.E.2d 1369 (1992); *Keefe v. Gimbel's,* 124 Misc.2d 658, 478 N.Y.S.2d 745, 750 (Civ.Ct.N.Y.Cty.1984); *Chilvers,* 453 N.Y.S.2d at 154.

34. Plaintiff also argued at trial that plaintiff's attorneys' fees should be taken into account in fixing the amount of punitive damages. In its post-trial brief, plaintiff cites *Jeffries Avlon v. Gallagher,* 149 Misc.2d 552, 567 N.Y.S.2d 339, 339–40 (Sup.Ct.N.Y.Cty. 1991) as authority for its position. That case held that it was appropriate for the trier of fact to consider attorneys' fees in connection with a determination of punitive damages in cases where malice has been proved. *Jeffries,* 567 N.Y.S.2d at 339–40.

35. However, consideration of attorneys' fees requires evidence of actual attorneys' fees. Although plaintiff presented evidence that his attorneys spent time valued at

over $700,000 (PDX D–13 & D–14), no evidence was presented to show the actual attorneys' fees incurred by plaintiff. In fact, plaintiff's counsel admitted at trial that the exhibits regarding attorneys' fees did not represent attorneys' fees either billed to or paid by plaintiff. (Tr. at 333.)

██ 36. Based on the evidence presented at trial, punitive damages of $100,000 are assessed against defendant Darsee and $150,000 against defendant Dragon.

### Conclusion

For the foregoing reasons, plaintiff is awarded compensatory damages of $34,880.28 on its copyright infringement claim and $27,880.28 trade secret misappropriation claims. Because the trade secret damages overlap with the portion of the copyright damages representing defendants' lost profits, the total amount awarded is $34,880.28. Plaintiff will also receive prejudgment interest at the rate of nine percent per year on the trade secret misappropriation damages, and prejudgment interest at the average annual rate of 52–week treasury bills on the remaining $7,000 of damages. Prejudgment interest shall be calculated from April 14, 1986. Plaintiff is also awarded punitive damages of $100,000 against Darsee and $150,000 against Dragon for willful trade secret misappropriation.

The foregoing shall constitute my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). Plaintiff shall settle judgment on two days' notice.

SO ORDERED.