Maurice J. MATHIE, Plaintiff,

v.

Roy FRIES, in both his individual capacity and his official capacity as Sergeant of Security, Suffolk County Correctional Facility, Defendant.

No. CV 91–0176(ADS).

United States District Court,
E.D. New York.

Aug. 5, 1996.

Arthur V. Graseck, Jr., Port Washington, New York, for plaintiff.

Robert J. Cimino, County Attorney, Hauppauge, New York (Robert Cabble, Scott Schneider, Assistant County Attorneys, of counsel), for defendant.

## MEMORANDUM AND ORDER

SPATT, District Judge.

The issues in this case concern a charge by an inmate at the Suffolk County Correctional Facility of sexual abuse by the Director of Security at the Facility. The complaint sets forth three causes of action. The first cause of action is brought under 42 U.S.C. § 1983 and alleges violations of the plaintiff's constitutional rights. The second cause of action is a state law claim for assault and battery. The final cause is based on a state law claim of intentional infliction of emotional distress.

## I. THE TRIAL–FINDINGS OF FACT

Prior to the events at issue in this case, the plaintiff Maurice J. Mathie (the "plaintiff" or "Mathie") had led a sordid life culminating in the commission of a homicide on August 20, 1989. He was, from an early age, a heavy drug user and stole jewelry from his mother to pay for drugs. He admitted that he collected large sums of money for a drug dealer and at one point in time was paid $1500 per day in cash and drugs. In fact, while incarcerated at the Suffolk County Correctional Facility he made telephone calls to a drug dealer's beeper number.

In August 1989, Mathie was indicted for murder in the second degree and incarcerated, as a pretrial detainee, in the Suffolk County Correctional Facility in Riverhead, New York ("SCCF"). The defendant Roy Fries (the "defendant" or "Fries") was, in 1989 and 1990, a sergeant and the head of internal security at the SCCF. Fries was employed by the Sheriff of Suffolk County in various capacities from 1969 for a period of 26 years until April 24, 1995, when he retired.

Called as a witness in the plaintiff's case, Fries testified that, as of February and March of 1990, he was bisexual and he knew that Mathie was a homosexual. As defined in Webster's Third New International Dictionary, a bisexual person possesses character and behavior typical of both sexes, and has sexual desires for members of both sexes.

In 1977 Fries was accused of improper conduct with regard to an inmate in the Suffolk County Jail in Yaphank, one Carlton Kruger. Fries was charged with fraternization with Kruger and was censured and instructed not to deal with prisoners on a social basis.

At the Riverhead SCCF, Fries, as head of internal security, had two offices. One was downstairs on the main floor and the second office was on the second floor. The second office could be locked from the inside, so that a person could not enter the office from the outside, even with a key. The second floor office had no windows. During this period Fries carried handcuffs while on duty. Fries used the second floor office to interview inmates. He also used the office to interrogate confidential informants. One of his duties was to assign inmates to certain areas in the facility, including protective custody and special housing, as a security measure. Fries had the power to place inmates in and to remove them from protective custody. For example, he placed all known homosexuals in the south block.

In early 1990 Fries had daily contact with the inmates. He used selected "informants," defined by him as persons who proved they were deemed reliable as a result of prior activities. He also used "snitches" who were inmates who wanted to be informants but were not reliable. Informants received certain benefits from Fries at the SCCF.

The issue of the plaintiff's visits to the second floor office of Fries is material in this case. Fries himself kept no records as to who visited with him on what dates. The only record of such visits were the logs in the housing area and in the lobby. Significantly, the Court finds that inmate Mathie was a private visitor to the Fries office much more frequently and for longer periods of time than any other inmate. On this subject, Fries testified as follows:

Q It's a fact, is it not, that during the period from December to April, December '89 to April of '90, Maurice Mathie was in your presence privately in your office much more frequently than any other prisoner?

A He was sent down to security probably much more than any inmate, yes.

Q And is it your view that even though he was sent down he didn't find his way— is it your contention that even though he was sent down to security, some many more times than others, he did not on each occasion find his way to security?

A I'm sure he found his way.

Q Well, on each and every time that he was sent down to security, did he go to security?

A To my knowledge, yes.

Q And it's a fact, is it not, that he did visit security during that time period, December '89 to April of '90, 20 or more times?

A That's what the books reflect, yes.

(Tr. at 41).*

In addition to the plaintiff's visits to the Fries office that were logged in, the Court finds that there were other visits by the plaintiff that were not recorded anywhere. These visits emanated from a practice of Fries to go to the visiting area, encounter the plaintiff and his visitor, and request that the plaintiff stop at his office directly from the visiting area. Those visits by Mathie to Fries' office would not be recorded in any log or other record. In addition, sometimes Fries would "reach out" for an inmate, and he kept no records of such visits.

In this regard the Court credits the testimony of the plaintiff's mother Shirley Mathie, with regard to these additional unlogged visits:

Q Now, during the period that your son was confined at the jail, do you recall with what frequency you visited him?

A Visiting was every other day. It's according to the alphabet. And I went every other day.

Q Referring to your testimony a minute ago, about when was it that you had this conversation with Sergeant Fries?

A I believe it was in January of '90.

Q And after you first had that conversation with him, did you ever see him again?

A Yes, many times in the visiting room, in the inmates' visiting room.

* Tr. refers to the Trial Transcript.

Q Do you recall any conduct or activities engaged in by him after you had first met him and while you were visiting your son?

A He would come in, say hello, how are you, kind of knock on the table and tell my son to come to his office after the visit.

Q How many times did he do that?

A Many. Many times.

(Tr. at 155).

In addition the Court finds that some of these visits in the second floor security office were lengthy, as long as an hour at a time, or longer. Further, Fries conceded that during the first three months of 1990, he met with Mathie more than he met with any other prisoner.

Q You would agree, wouldn't you, that you spent some 20 hours with—well, you had some 18 visits with Mr. Mathie?

A Okay.

Q Is that accurate? Do you acknowledge that?

A Yes.

Q And one or more of these visits was an hour long?

A Yes.

Q And that was more time than you would spend with most prisoners, isn't that so?

MR. CABBLE: Objection.

THE COURT: Overruled.

A Yes.

(Tr. at 102).

Fries testified that he first met Mathie when the plaintiff made a request to be moved to another housing area because he thought he was going to be sexually abused by a "big black inmate." His first meeting with Mathie, on January 24, 1990, was in the first floor office. As a result of this request, Fries placed Mathie in protective custody. Fries said he regarded Mathie as a "snitch," an inmate who wanted to be an informant, "because he called all the time." This first meeting lasted for approximately five hours. During this meeting Mathie told Fries that he was a homosexual. Although Fries testified that Mathie initiated every meeting be-

tween him and Fries, the Court does not credit this testimony. On the contrary, the Court finds that Fries initiated most of the meetings.

Although purportedly, Fries did not recall much of what went on during these meetings, curiously, Fries testified that, somehow, Mathie knew his home address and his unlisted home telephone number. Even more surprising, Fries testified that during these meetings, Mathie admitted to committing the murder he was charged with, and Fries conceded that he did not disclose that incriminating information to anyone. Despite the fact that Mathie was indicted for that murder and had not yet pled guilty to that crime, Fries failed to disclose this material inculpatory admission. Not only did he fail to disclose this admission, but he lied to Internal Affairs Investigator Johnson, and initially told the investigator that Mathie did not confess to him.

One of the benefits given to informants was the right to make phone calls from Fries' office. Fries conceded that the plaintiff, although not an informant, was also given that privilege. Asked to describe what occurred in these many visits to his second floor security office, Fries stated that Mathie used his phone to call his attorney and "maybe his mother, maybe his sister." Fries said he had a practice of letting inmates make phone calls from his office, "if he felt it was necessary." The Court finds that Fries never satisfactorily explained what took place in his office during these meetings.

On cross-examination, in response to questions by the Assistant County Attorney, Fries testified that he had no sexual contact with Mathie, did not handcuff him to a pipe in the second floor security office and did not sodomize him. Again, the Court declines to credit this testimony; the great weight of the evidence proves otherwise.

The plaintiff Maurice J. Mathie is presently an inmate at the Woodbourne Correctional Facility in Woodbourne, New York. He pled guilty to the crimes of manslaughter in the first degree and conspiracy in the third degree, both arising from the homicide charge, and is serving consecutive sentences totalling 10 to 30 years. His prior criminal record consisted of four traffic violations. He was arrested in connection with the homicide charge on August 22, 1989 and was sent to the SCCF on August 23, 1989. When he was processed in the bullpen, both he and his co-defendant Andrew Nappi told Corrections Officer Hammond "that we were both gay." (Tr. at 225). In October 1989, at the request of Mary Filou, the prison psychiatric social worker, Mathie was transferred to protective custody, because he was gay.

Mathie testified that the first time he spoke to Roy Fries was late in January 1990. The plaintiff requested this first meeting. All the other meetings were initiated by Fries. During that first meeting at the first floor security office, which lasted approximately five hours, Fries asked the plaintiff questions about his sexual orientation.

THE COURT: Just tell us what he said.

THE WITNESS: Okay. He was asking me questions about my sexual orientation, when did I know I was gay? How long was I gay? Did my family know? Was I out of the closet? What type of men do I look for? Do I have a lover on the street?

. . . .

THE COURT: Is this the first meeting?

THE WITNESS: Still the first meeting, Your Honor. The first meeting lasted for approximately five hours.

THE COURT: Five hours.

THE WITNESS: Yes, sir.

After he was asking me questions about my co-defendants and my job and my life on the outside, he started asking me questions to the effect of am I feeling what he's feeling. And at first it kind of threw me back, I didn't know he meant by that. So I asked him again, what did you say? And he repeated it a second time, and then he said, well, you know, what I'm talking about. And I was afraid to answer him because I didn't know exactly what he meant.

So I kept trying to make him come out more direct and he wouldn't. That was towards the end of the meeting and that's when I was returned to my housing unit.

It was late at night. The whole jail was locked down.

BY MR. GRASECK:

Q The five hours was from when to when, if you can estimate it?

A I don't know. I'll say 10 p.m. or after 10 p.m. I was returned to my housing unit.

(Tr. at 233–234).

The second meeting with Fries took place in his second floor security office. At this meeting Fries asked the plaintiff "How was I doing," and "if I needed something don't hesitate to ask him." The next day Fries called the plaintiff in for a third meeting. At this time Fries told Mathie "that he was attracted to me." Mathie testified that Fries instructed him to "come see him" about twenty-five times. From five to ten visits emanated from the times Mathie was in the visiting area and Fries would come over to the table, speak to my mother or sister and "tell me to come and see him after my visit."

Mathie testified that, after four or five of these meetings, the conduct of Fries "went beyond mere talk." Mathie related what occurred:

A He reached across the desk to hold my hand, he kept making remarks about my eyes, and he was just expressing his interest in me.

(Tr. at 237).

After that, Mathie recounted increasing physical conduct by Fries during "many meetings" at many different times for many different durations. The Court finds that Mathie's testimony about the occurrences in the second floor security office was believable and makes the following findings of fact:

The Court credits Mathie's description of this progressing physical sexual conduct by Fries described in vivid detail:

I guess by the middle of February there was a time where he would wheel his chair in front of mine where I was sitting and put his hands on my thighs and start talking to me, rubbing my thighs, grabbing for my hand to hold my hand, and with each visit it just kept progressing.

. . . .

Q Just going back now.

You indicated there was a progression of activities. Could you describe what occurred between you and Sergeant Fries on these various occasions after—well, what activities did he engage in with you?

A By the end of February it had gotten to the point where he would call me out to his second floor or first floor office. He would begin my (sic) touching my thighs, rubbing his hands up and down my thighs, trying to get me aroused, tugging at my pants to get my pants down to expose my penis. He would attempt to perform oral sex on me.

By the beginning of March or even still the end of February there was times he exposed his penis to me through the zipper of his pants and attempted to pull my face into my penis to try to get me to perform oral sex on him. In a standing position he would try to get me to massage or masturbate him through his pants while he was trying to stick his tongue in my mouth, trying to kiss me, trying to hold me.

. . . .

Q On how many occasions, if you can estimate, did he expose himself to you?

A About four or five times.

Q Can you describe the appearance of his penis?

A I can try. I'm not a doctor. I can try.

Q What do you remember about it, if anything?

A I remember that he is circumcised, I remember that at the time he was wearing boxer shorts. I remember that with an erection the head of his penis is the same size as the shaft, that it is more blunted than it is pointed.

(Tr. at 238–240).

Mathie testified that he met with Fries in the first and second floor security offices a total of about 35 times. These visits extended from January 24, 1990 to the end of March or beginning of April 1990. During these visits, Fries performed sexual acts on him, or attempted to do so at least 20 times. Fries attempted to perform oral sex on Ma-

thie seven or eight times, and attempted to make Mathie perform oral sex on him six or seven times. Mathie also testified to many other incidents, which the Court declines to detail in this opinion, and, instead, refers to the trial transcript at pp. 387–388.

Mathie described the final episode in this sorry tale of sexual abuse which took place in mid-March 1990, probably on March 17, 1990. (Tr. at 424). The Court refers to the trial transcript at pages 241 through 244 for the testimony of Mathie describing this event in detail. Briefly, for the purpose of this decision, the Court makes the following findings of fact: With the door of the second floor security office locked from the inside, as was always done, Fries grabbed Mathie from behind in a bear hug, handcuffed his hands around two vertical poles or pipes in the corner of the office, undressed and rubbed lotion on both of them and penetrated Mathie from behind. After this act of sodomy was completed, Fries said he loved Mathie, and Mathie was told "to keep my mouth shut." As a result of this anal sodomy, Mathie sustained anal bleeding, and a burning feeling that persisted for a week. The Court finds that the plaintiff proved that this act of anal sodomy by Fries did occur.

Asked when this incident took place, Mathie testified that it was "a day or two before his (Fries') daughter's wedding," estimated to be during the week of March 17, 1990. Although the plaintiff was somewhat confused about the date of this occurrence, the Court credits Mathie's testimony as to the events which occurred in this final act of sexual abuse.

There were certain inconsistencies and varying testimony by the plaintiff with regard to the number of visits to Fries, and the dates of the visits. The Court finds that, under the circumstances, this lack of specificity and clarity is understandable. The Court finds the plaintiff's testimony to be credible, when he stated:

Q Now, can you explain any incorrectness in numbers that you may have given as to events with Fries? You indicated certain numbers in the FBI report may not be completely accurate. Is that so?
A Yes, that's true.

Q Can you explain why that might be?
A Because there were so many different times and different places that it happened, I wasn't writing them down. It's like everything is a big blur. This whole two months, two-and-a-half months, everything is enmeshed together, hard to distinguish.

(Tr. at 426).

Within a week or two of the above-described incident of sodomy, Mathie told "a portion of the story" to Mary Filou, the prison psychiatric social worker. He told her "everything but the anal sodomy." Mathie made Filou promise not to tell anyone. Filou then told a deputy warden but did not reveal the plaintiff's identity. Subsequently, Mathie described the entire incident to Filou.

As a result of the disclosure to Mary Filou, the Internal Affairs Division of the Office of the Sheriff of Suffolk County commenced an investigation, initially to determine the identity of the inmate involved in the sodomy incident. At that point, being urged to come forward by Mary Filou, Mathie wrote two letters. The first letter, dated April 6, 1990 was to his attorney Eric Naiburg (Defendant's Exh. N). In this letter the plaintiff denied that he had been sexually abused by Fries. Among other things Mathie wrote that "I had nothing to do with these lies." The Court finds that this letter, falsely denying the sexual abuse allegations, was written by Mathie when he was in fear of retribution by the powerful Chief of Security at the SCCF. Mathie testified that, at this time, his mail was being stolen and he feared retaliation from Fries.

In his second letter, written to Deputy Warden Salvatore Romano, dated April 13, 1990, Mathie requested a meeting in person with Warden Romano at the County Court, so that it "doesn't attract any attention" to discuss a "problem" (Defendant's Exh. O). As a result of his communication to Deputy Warden Romano, on April 17, 1990 Mathie was taken to the County Court, where he met with the Under Sheriff, two representatives of Internal Affairs and his then attorney. At that time Mathie signed a written statement (Defendant's Exh. S). In the

statement he related four separate incidents by Fries but he omitted the final incident involving the anal sodomy while being handcuffed. In this written statement given to investigators of the Sheriff's Department, Mathie did describe many acts of sexual abuse by Fries. Among other acts, he described the touching, grabbing, oral sex on him, and the request by Fries for a "relationship."

Mathie was called down to Filou's office and he told her he did not tell Internal Affairs about the sodomy. She advised Mathie to tell everything to Internal Affairs. As a result, Mathie met with Investigator John F. Johnson in Filou's office and gave him a second statement including a description of the handcuffed sodomy incident.

A considerable account of testimony and photographic evidence was adduced on the question of the vertical pipe coverings in the second floor security office. Much of the evidence was contradictory and inconclusive with regard to the plaintiff's claim that the pipe coverings were damaged, removed or replaced after he was handcuffed around the pipes at the time of the sodomy. The failure of conclusive proof as to the condition of the vertical pipes after the handcuffed incident, does not, in any way, detract from the convincing and believable quality of the plaintiff's testimony as to the anal sodomy incident. The Court finds that the plaintiff proved that this deplorable and dastardly act did occur.

Mary B. Filou is a senior psychiatric social worker. She is licensed and certified. Filou was employed as a Clinic Administrator for the Suffolk County Mental Health Services since April, 1968. In December 1976, she began employment as Administrator of the Mental Health Service at the SCCF. Since November 1991 Filou has been a part-time consultant for the Suffolk County Mental Health Services. At the critical times at issue in this case, namely, between January 1990 and August 1990 Filou was the Mental Health Administrator at the SCCF.

Filou testified that in the early months of 1990, Mathie "told me that there had been sexual abuse, and that he had been cuffed to the bars and that sexual abuse had taken place—cuffed to pipes, I believe it was, and that the sexual abuse had taken place." (Tr. at 476). Filou testified that Mathie "had been reluctant to discuss it . . . he was frightened and seemed reluctant to give his name and to come forward." (Tr. at 477). Although Mathie asked her not to report these incidents, Filou did report it to Deputy Warden Romano one or two days later, without revealing the plaintiff's name. Eventually, Mathie came forward and revealed that he was the person involved.

Filou had first seen Mathie in late 1989, prior to these incidents. After Mathie complained of this abuse, she noticed certain changes in the plaintiff, the major change being "fearfulness" and a "high level of anxiety." Filou stated that the plaintiff "exhibited some symptoms of post-traumatic stress syndrome, specifically anxiety and stress and related behaviors." (Tr. at 490, 491). Filou testified she did not record these complaints in her medical records because of the sensitive nature of the disclosures, which involved persons in the jail, and in part because she wanted to protect the individual involved. Filou obviously believed the plaintiff's version as to the happening of these incidents and that he was not malingering.

On cross-examination, Filou testified that Mathie had symptoms of an anti-social personality disorder, which loosely means someone who commits anti-social acts and shows lack of remorse and poor social judgment. She based this opinion on the fact that Mathie committed a homicide.

Dr. Richard Dackow, is a clinical psychologist employed as a diagnostic specialist by the Suffolk County Probation Department. He worked at the SCCF from 1977 to 1991. In 1990 he was employed at both the Riverhead and Yaphank correctional facilities. He occasionally used the second floor security office at Riverhead to interview people. Dr. Dackow recalled that in 1989 or 1990, the pipe covers on the vertical pipes in the second floor security office were changed. Prior to the change the pipes were covered with white insulation. Then the room was painted and he believes that the pipe coverings were changed and were painted blue.

Investigative Sergeant Francis J. Totten, Jr. was advised by the Sheriff of Suffolk County to initiate an Internal Affairs investigation with regard to Mathie's complaints against Fries. As part of his investigation, Totten obtained the prison logs reflecting the amount of time that Mathie was logged out to meet with the defendant Fries. Examination of these logs revealed that Mathie and Fries were together alone approximately "seven times the time of any other prisoner." They were together in private visits between 18 and 20 hours. However, he stated that there "could have been" other security officers in with them at these meetings. The Court notes however, that Fries never stated that any third party was ever present when he met with Mathie. Totten's investigation also revealed that some of the visits by Mathie to Fries' office were late at night. Also, he confirmed that Fries kept no records of any kind. When Sergeant Totten asked Fries to explain why he spent so much time with Mathie, he stated that Fries "didn't give us a pinpoint answer—it was generalizations." In addition, Mathie was usually the last inmate Fries would interview, and, again, Fries had no explanation for that occurrence.

As part of his investigation, Totten also obtained the records of the phone calls made from Fries' office. This was done to attempt to corroborate Fries' statement that he permitted Mathie to call his attorney, Eric Naiburg from the security office. Upon a review of the phone records, Totten "could not find any phone calls from the internal security office to Mr. Naiburg's office."

In addition, as part of his investigation, on June 2, 1990, Totten photographed the second floor security office. He discovered that "there is a piece of pipe going from floor to ceiling where the bottom half of the pipe covering was off the pipe." He stated that "the (pipe) covering appears to be missing, and it is an approximation, from the bottom of the floor to about three feet high." Totten believed that Mathie stated that he was fastened to these two pipes.

Sergeant Totten conducted two interviews of the defendant. At first Fries stated that Mathie never gave him any details about the murder charge. However, the defendant later changed his statement and related how "Mathie basically confessed his involvement in the murder to him" but, for some reason, Fries never revealed this admission to anyone. This significant testimony follows:

Q So, he (Fries) first said, declared that Mathie never gave any details about the charge of murder which he was facing; is that right?

A Correct.

Q And there was thereafter a break in the interview, and you were out of the presence of the Sergeant for some period of time?

A There was a break in the interview. I don't know if I was out of the presence of the Sergeant or not. But the Sergeant goes on to relate how Mathie basically confessed his involvement in the murder to him.

Q And after you took the break the Sergeant gave you rather precise and elaborate details of how the crime was allegedly committed; is that right?

MR. CABBLE: Objection to the characterization.

A Correct.

MR. GRASECK: I think the witness said "correct," I believe.

THE COURT: Is that correct?

THE WITNESS: Yes, that's correct.

Q And do you recall if he was there after he asked—well, whether he (Fries) reported the alleged confession to anyone?

A Yes, he was asked that question.

Q And he (Fries) declared he never reported it to anyone; isn't that so?

A Correct.

(Tr. at 602–603).

Sergeant Totten also interviewed the plaintiff twice during which the plaintiff "broke down and cried" at the same point in the investigation.

John F. Johnson is a Deputy Sheriff Investigator for the Sheriff of Suffolk County. As of April 1990, his rank was lower than Sergeant Fries. He participated in the investigation of the complaints by Mathie of sexual abuse by Fries. He reviewed the logbooks in the Riverhead jail, which indicated that

Mathie was in Fries' office on 18 separate occasions for 20 hours logged time. The logbooks reveal that the first such visit was on January 24, 1990. Johnson also testified that Mathie told him that there could have been more visits than what appeared in the logs. Johnson reported that the time Mathie was with Fries in that office was seven times more than any other inmate. He further reports that 10 of the 18 logged meetings occurred in the evening, after 6:00 p.m., and Fries requested overtime payments for about half of these logged visits. One of the logged meetings started at 8:46 p.m. and "most of the time" Mathie was the last inmate interviewed by Sergeant Fries. Johnson found this situation to be "odd." Nor did Fries satisfactorily explain these "odd" circumstances:

Q Well, did you make mention—when you asked that question you had a concern about that, is that fair to say?

A Yes.

Q You felt that there might be an indication of some possible wrongdoing?

MR. CABBLE: Objection.

THE COURT: Overruled.

A I felt it was an area I wanted to explore. I thought it was certainly odd that if he saw a group of inmates that Mathie would be amongst the last one all the time.

Q And you don't remember any response that satisfied your concern, is that fair to say?

A I'll repeat my answer, sir. I don't recall his response. But I felt in general that the responses didn't answer why he spent that much time.

Q And did that seem to be compelling?

A I felt that I needed more information.

Q Which you never were able to get, correct?

A Sergeant Fries didn't keep records, therefore, he couldn't give me an answer.

. . . .

Q Well, in your report you declared, did you not, that he couldn't give a reasonable explanation for all the time that he spent with Mathie?

A Yes, sir.

. . . .

Q And in none—there wasn't any particularly compelling answer as to why any of those things were true, right?

MR. CABBLE: Objection.

THE COURT: Overruled.

A Yes, sir. As I said in the report because of his lack of or nonexistent records he couldn't give me an answer that I could accept as factual.

. . . .

BY MR. GRASECK:

Q One of the explanations you have given us with respect to Sergeant Fries, as to time spent between the plaintiff and the defendant is that the plaintiff just wanted to talk; is that correct?

A Yes.

(Tr. at 691–693, 806, 811–812).

Deputy Sheriff Johnson discovered that Mathie knew the unlisted home phone number of Fries and his home address. Johnson questioned Fries about how this could have happened but never received a credible explanation for that strange circumstance. Also, although Fries told them that Mathie used the phone in his office to call his attorney Eric Naiburg, they could find no record of such phone calls.

Johnson also corroborated Sergeant Totten's testimony as to Fries changing his story as to whether Mathie admitted committing the charged homicide. In fact, Fries told them that Mathie had given him precise details about the murder, including his use of a crowbar and wrapping a bag around the deceased's head and putting him in a carpet. Asked to explain why he did not report this confession by Mathie to the homicide he was charged with committing, Fries told them that "he didn't realize it was a murder involved."

In addition, Johnson testified that Fries could not locate any of the documents he requested. Also, Fries could not explain what took place in his office during the numerous and lengthy Mathie visits.

Q Now, you were discouraged, were you, by the fact that you couldn't explain the time spent between the plaintiff and the defendant?

A I don't know if I said discouraged, but I didn't get an answer that I wanted, sir, that would fully explain it.

Q And you were somewhat frustrated by that?

A I suppose you could say frustrated, sir.

Q And it was your assessment that the average inmate would spent (sic) some 25 minutes with Sergeant Fries, and Mr. Mathie would spend an hour and a half or sometimes more with the sergeant?

A Yes, sir.

(Tr. at 797).

In early June 1990, Johnson inspected the second floor security office and took photographs which were introduced in evidence. In one corner of the small office were two vertical pipes. One of the pipes was completely covered with white fiberglass material. The other pipe was exposed on the bottom half, maybe 30 to 32 inches from the floor and painted black.

Robert W. Dumond is a licensed mental health counselor who is an expert in male prisoner sexual abuse. Dumond's services were apparently rendered without compensation. His testimony by deposition, and his report was apparently advanced by the plaintiff on the issues of both liability and damages. This portion of his testimony is reviewed by the Court on the issue of liability. Dumond has considerable experience in the area of assessing victims of sexual assault and in treating such victims. Dumond was consulted by the plaintiff's attorney and interviewed Maurice Mathie on one occasion on December 17, 1994. He administered a Beck Depression Inventory Test. At the trial the Court was presented with a medical report from a clinical neurologist, dated April 23, 1996, that disclosed that Robert Dumond sustained a closed head injury, is under medical treatment and cannot travel. The report further stated that Dumond had "cognitive difficulties" and was not able to participate in any court proceedings or testify. Based upon the unavailability of the witness, the Court permitted his deposition to be placed in evidence. See Rules of Civil Procedure 32(a)(3)(C). In addition, Dumond's report dated January 25, 1995 was offered in evidence as Defendants' Exh. AM.

■ Surprisingly, the detailed 298 page deposition of Dumond is not of great assistance to the Court in its search for the truth. Much of the deposition concerns Dumond's qualifications, which, despite his lack of an M.D. or Ph.D. degree are excellent in the field of male inmate sexual abuse. However, little value can be given to the testimony of Dumond. First, he never examined any of the plaintiff's medical records. Second, the Court is reluctant to give credence to the testimony of an expert as to the credibility of a witness, in this case the plaintiff.

■ In the field of rape trauma, the case of *People v. Bennett,* 79 N.Y.2d 464, 583 N.Y.S.2d 825, 593 N.E.2d 279 (1992) is instructive. Evidence of "rape-trauma syndrome" as to ordinary responses of rape victims is generally accepted in the relevant scientific community. See *People v. Taylor,* 75 N.Y.2d 277, 552 N.Y.S.2d 883, 552 N.E.2d 131 (1990). However, such evidence is not admissible in all instances. For example, "expert opinion is inadmissible when introduced merely to prove that a sexual assault took place ... or to bolster a witness' credibility.... In such instances, the potential value of the evidence is outweighed by undue prejudice to the defendant or interference with the province of the jury." *Bennett,* 79 N.Y.2d at 473, 583 N.Y.S.2d at 831, 593 N.E.2d at 285.

■ The decision whether to admit expert testimony under Fed.R.Evid. 702 is vested in the broad discretion of the trial court. *United States v. Ruggiero,* 928 F.2d 1289, 1304 (2d Cir.), *cert. denied,* 502 U.S. 938, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991). Dumond's report makes certain conclusions "with a high probability of confidence." He concludes that Mathie "was likely the victim of a series of sexual assaults while incarcerated by Sgt. Fries." This evidence goes to the ultimate issue as to whether the plaintiff was sexually assaulted by Fries. Although the Federal Rules of Evidence do not bar all

expert testimony concerning an ultimate issue, *see* Fed.R.Evid. 704, a district court may exclude ultimate issue testimony under Federal Rule of Evidence 702 when it is not helpful to the trier of the facts or under Rule 403 when it may be unduly prejudicial. *See United States v. Schatzle,* 901 F.2d 252, 257 (2d Cir.1990); *United States v. Brown,* 776 F.2d 397, 401 n. 6 (2d Cir.1985), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986).

In this case, the Court is capable of assessing the credibility of the key witnesses on its own and finds that Dumond's testimony on the issue of whether the sexual abuse did occur is unduly prejudicial and will be ignored by the Court. *See United States v. Serna,* 799 F.2d 842, 850 (2d Cir.1986), *cert. denied,* 481 U.S. 1013, 107 S.Ct. 1887, 95 L.Ed.2d 494 (1987) (No error to exclude expert testimony on the lack of reliability of eyewitnesses); But see *Arcoren v. United States,* 929 F.2d 1235, 1240 (8th Cir.) (In unusual circumstances district court did not abuse discretion in admitting expert testimony regarding battered woman syndrome), *cert. denied,* 502 U.S. 913, 112 S.Ct. 312, 116 L.Ed.2d 255 (1991). *People v. Yates,* 168 Misc.2d 101, 637 N.Y.S.2d 625 (Sup.Ct. N.Y.Co.1995) (Rape trauma syndrome evidence is extended to males).

The defendant produced Gaetano DiSilvestro, also known as Thomas Michael Rogers, an incarcerated inmate presently serving 8 to 16 years. DiSilvestro testified that in January through March 1990 he was an inmate in the SCCF, charged with attempted burglary and arson. He stated that he is known to be a "roughneck in the jail ... (and) was causing trouble, beating up a lot of people." (Tr. at 736). He was put in the bullpen to cool off. While in the bullpen he met the plaintiff. DiSilvestro told Mathie that he didn't like Sergeant Fries. Then, according to DiSilvestro, they concocted a plan, which was Mathie's idea, as follows:

A And he told me, you know, he wanted to get Fries and I wanted to get Fries, and we concocted a little plan.

Q What was that plan?

A Well, it was his idea, it wasn't my idea because I'm not with that kind of thing.

We could set Officer Fries up and say that he assaulted us, say that we could have had it worked out, go to Mary Filou, cry to Mrs. Filou, tell Mrs. Filou how Officer Fries totally destroyed our lives and so forth.

Q Anything else besides that?

A I don't know what you mean.

Q Well, what was it that you were to tell Ms. Filou, how was Roy Fries to destroy your life?

A Saying that he sexually assaulted us.

Q What else do you remember about the conversation?

A That was basically it, you know.

Q Did he mention anything to you about a lawsuit?

A Oh, of course, no question. I would collect a lot of money. You know, I can't get into something like that. I mean how could I say that someone fucked me in the jail as big as I am, it's not like me. So it aggravated me, still aggravates me.

Q What, if anything, did Mr. Mathie tell you about collecting money?

A It would be a good suit, they would brief us if we left a paper trail, mental held (sic) would believe us.

Q Did he indicate why mental health would believe you?

A From Mrs. Filou.

(Tr. at 737–738).

DiSilvestro left the SCCF on March 5, 1990. He found out about the plaintiff's "scheme" when he was in the "box" at Attica, when a friend wrote him about the accusations made by Mathie against Fries and then it occurred to him that they had planned this course of action. DiSilvestro explained that he came forward with this testimony because he turned his life around, "became a Christian and felt bad that he (Fries) was being accused." He then wrote a letter to a deputy warden in the SCCF, on June 12, 1995. In that letter he knew how to correctly spell the plaintiff's name as "Maurice Mathie." DiSilvestro testified that he was not promised anything in return for his testimony.

On cross-examination, DiSilvestro admitted that he assisted Internal Affairs in the Suffolk office on other matters, and gave a statement to Internal Affairs in another case. DiSilvestro declined to reveal the name of the friend who wrote to him in 1995 about the Mathie accusation against Fries, because the friend is an "organized crime member." When requested to produce the letter from his friend with the name redacted, DiSilvestro produced only page 3 of the letter. Asked the name of the church he was now affiliated with, DiSilvestro stated he was not associated with any church, but was "striving to be a Christian."

DiSilvestro testified that on the day he had this "conversation" with Mathie, there were three or four other inmates in the bullpen. Further, he stated that Mathie talked openly about this "scheme" in a manner which allowed the three or four other inmates to hear the conversation. He stated that Mathie was in County Court with him one day either in front of Judge Rudolph Mazzei or Judge Cacciabaudo. In court that day they were in a holding area between the courtrooms of Judge Mazzei and Judge Cacciabaudo. In later testimony of several witnesses, doubt was raised whether an inmate like DiSilvestro would have been allowed to mingle with inmates such as Mathie.

The Court declines to credit the testimony of DiSilvestro concerning the alleged conversation with Mathie in the bullpen of the SCCF. The Court finds that this witness is not believable and, in fact, his testimony borders on being incredible.

The defendant also produced Dr. Eileen Treacy, a psychologist, who is an expert in sexual abuse, behavioral psychology and testing. Dr. Treacy was trained by the New York City Police Department and the Federal Bureau of Investigation in the investigation of sex crimes, both as to offenders and victims. She has extensive experience working with the victims and perpetrators of sexual abuse and the results of such abuse. In preparation for her testimony she reviewed the plaintiff's medical records in various penal institutions, an FBI report by Special Agent Hughes, certain psychological evaluations, Mathie's confession, the Suffolk County

Internal Affairs report, the SCCF logs, the depositions in this case including the deposition testimony of Robert W. Dumond, the plaintiff's expert on sexual abuse, and certain letters.

Dr. Treacy reviewed Dumond's report in detail. In her opinion, Dumond did not adequately investigate the plaintiff's subjective complaints, did not perform the required psychological tests, except for the Beck Test which showed that the plaintiff was mildly depressed, and did not adequately factor in the possible motive of secondary gain. Dr. Treacy stated that, in her opinion, Mr. Dumond had a confirmation bias. Further, she stated that if Mathie was depressed while in prison prior to the alleged sexual abuse, "one would not be able to say that the trauma caused that pre-existing symptomatology."

Dr. Treacy discussed the subject of a person with an anti-social personality disorder, namely, showing traits of being a liar, schemer and manipulator. Dr. Dackow also testified that a person with an anti-social personality is manipulative and without remorse. According to Dr. Treacy, "there is certainly an indication that Mr. Mathie has some of those traits." However, Dr. Treacy stated that she would not presume to diagnose Mathie because she has not seen him or evaluated him. She stated that based on his criminal record, his use of drugs, his inability to hold down a job, the serious crime he committed, and other matters in his history, "This, under normal circumstances, would raise one's antenna at a minimum." Nevertheless, Dr. Treacy expressly stated that she is not saying that the plaintiff is suffering from an anti-social personality disorder.

Dr. Treacy also stated that psychologists should not make determinations as to credibility. The Court agrees and has made and will make the required determinations as to the credibility of the witnesses in this case.

Dr. Treacy also reviewed the plaintiff's medical records at the New York State correctional facilities following the alleged incidents of sexual abuse. On July 21, 1992 the plaintiff's strengths were listed as being well nourished and having good verbal skills. The weaknesses were noted as being anxious,

manipulative and less than candid. Dr. Treacy stated that "the manipulative issue could also be indicative of anti-social personality deficit or disorder." Asked her opinion as to Dumond's evaluation, Dr. Treacy stated that "the reliability and validity of this evaluation is suspect because of the reasons that I have indicated." (Tr. at 906).

On cross-examination, Dr. Treacy testified that it would have been helpful to have interviewed and examined the plaintiff. However, she stated a personal interview was not necessary for her purpose which was only to "analyze and assess the assessment procedure of Mr. Dumond." (Tr. at 910). She also conceded that "scanning," wringing of hands, fidgeting and fine tremors of the hands and fingers, all symptoms of the plaintiff as reported by Dumond, would be objective manifestations.

Questioned about sexual abuse to an incarcerated male, Dr. Treacy's answers are illuminating:

Q It is particularly humiliating for a male to be raped; is that correct?

A I think it is particularly humiliating for anybody to be raped.

Q And a victim of rape in complaining about it exposes himself, does he not to a good deal of stigma?

A Within many environment studies, that's true.

. . . .

Q Those who are incarcerated, whether men or women, are in a position of virtual powerlessness; is that right?

A In many respects.

Q Would that be a factor if you were trying to assess the candor of someone who complained that the head of security raped him or sodomized him, would his powerlessness and his incarceration in this facility, would that be a factor in assessing candor or secondary gain?

A You are mixing up candor and secondary gain now.

Let me say the issue of powerlessness is an issue for every rape victim, whether raped in the work place or the house, or in a jail. Powerlessness is an issue that is pervasive in this content area. Certainly jails carry that as well as every place else.

Q But a jail gives it another dimension, isn't that so?

A Jails give it another dimension because of the lack of ability to move about freely, certainly. And also the lack of ability to draw upon one's support systems the way one might be able to do if they were outside.

(Tr. at 915–917).

Dr. Treacy conceded the obvious fact that a person with an anti-social personality disorder can be sexually assaulted, but in evaluating such a claim one must take greater care and caution. She further conceded that Dumond was trained in preliminary and advanced rape investigation; was responsible for training the Massachusetts Department of Corrections in that field; and led a workshop at the American Psychological Association convention on training staff in connection with male rape issues. She also stated that Dumond focused his attention more narrowly than she did on the issue of "male incarcerated assaults." (Tr. at 952). She also testified that the defendant had been reprimanded by two different sheriffs for "improper dealings with prisoners." (Tr. at 947).

■ After a review of the testimony and exhibits at this bench trial, the Court finds that the plaintiff Maurice J. Mathie has proved, by a preponderance of the credible evidence, that he was repeatedly sexually abused by the defendant Roy Fries, the Chief of Security at the Suffolk County Correctional Facility. Further, the Court finds that the plaintiff proved, by a preponderance of the credible evidence, that the defendant Fries sodomized him while he was handcuffed to pipes in the second floor security office.

In this regard, as stated above, the Court credits the testimony of the plaintiff Mathie as to all the incidents of sexual abuse and the anal sodomy. His testimony is direct evidence of these distressing acts. In addition, the Court finds that there is substantial circumstantial evidence supporting the plaintiff's testimony. This convincing circumstan-

tial evidence, much of it conceded by Fries, includes the following: the great number of visits by Mathie to Fries in his second floor office, more than any other inmate; the length of the visits to Fries' office; the time of the visits, generally later in the day and into the evening; the conceded facts that Mathie is a homosexual and Fries is bisexual; the confession by Mathie to the murder charge, which was unreported by Fries; the unexplained fact that Mathie knew the unlisted home telephone number and address of Fries; the many misrepresentations by Fries to the Internal Affairs investigator, including the alleged telephone calls by Mathie to his attorney that were never made; the fact that Fries could not explain the reasons for these many meetings, nor could he describe what occurred at the meetings; the plaintiff's early complaints to his mother and to Mary Filou; and Mary Filou's testimony as to the rapid and noticeable change in the plaintiff's emotional state.

In sum, the Court finds that the totality of the evidence establishing the sexual abuse and sodomy is overwhelming.

## II. THE CAUSES OF ACTION AT ISSUE

### A. The Section 1983 Cause of Action

Count one of the complaint is brought under 42 U.S.C. § 1983, and seeks damages "caused by the unlawful and unconstitutional sexual harassment and assaults upon the plaintiff by the defendant Roy Fries from January through March 1990." The complaint alleges a deprivation of rights granted under the Fourteenth Amendment.

■ A pretrial detainee is not protected by the Eighth Amendment's proscription against cruel and unusual punishment since the detainee has not been convicted of a crime. Graham v. Connor, 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 1871 n. 10, 104 L.Ed.2d 443 (1989); City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983); Bell v. Wolfish, 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979); Ingraham v. Wright, 430 U.S. 651, 671–72 n. 40, 97 S.Ct. 1401, 1412–13 n. 40, 51 L.Ed.2d 711 (1977). However, the Due Process Clause of the Fourteenth Amendment protects pretrial detainees from punishment without due process since they have not been convicted of a crime. See United States v. Salerno, 481 U.S. 739, 746–47, 107 S.Ct. 2095, 2101–02, 95 L.Ed.2d 697 (1987); Bell, supra, 441 U.S. at 535–36, 99 S.Ct. at 1871–73. The protections of the Due Process Clause are at least as great as those of the Eighth Amendment. Revere, supra, 463 U.S. at 244, 103 S.Ct. at 2983; Gary H. v. Hegstrom, 831 F.2d 1430, 1432 (9th Cir.1987) (a detainee who has not been convicted of a crime is entitled to a more protective Fourteenth Amendment standard). In Brown v. Doe, 2 F.3d 1236, 1242 (2d Cir.1993), cert. denied, 510 U.S. 1125, 114 S.Ct. 1088, 127 L.Ed.2d 403 (1994), the Second Circuit reiterated that the Due Process Clause protects a pretrial detainee from the use of excessive force. See also Brogsdale v. Barry, 926 F.2d 1184 (D.C.Cir. 1991).

■ Although prisoners have no right to privacy in a jail cell, Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), and a prisoner may be subjected to strip searches and body cavity searches conducted in a reasonable manner, Bell v. Wolfish, supra, 441 U.S. at 561, 99 S.Ct. at 1885–86, a prisoner may not be subjected to malicious searches of his person or intentional harassment. Hudson, 468 U.S. at 528–30, 104 S.Ct. at 3201–02. Moreover, neither Hudson nor Bell deprive a prisoner of the right to bodily privacy. See also Huffman v. Fiola, 850 F.Supp. 833, 837 (N.D.Cal.1994).

■ The Due Process clause of the Fourteenth Amendment provides that "No State shall ... deprive any person of life, liberty or property without due process of law." The Supreme Court has held that the Due Process clause protects individuals against two types of government action, namely, procedural due process and substantive due process. So-called "substantive due process" prevents the state, represented in this case by the Sheriff's office, from engaging in conduct that "shocks the conscience." United States v. Salerno, 481 U.S. 739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987).

Courts have held that a prisoner has a cognizable claim under Section 1983 for sexual harassment when the alleged conduct constitutes a departure from "the evolving standards of decency that mark the progress of a maturing society" and the defendant acted with intent to harm the prisoner. *Thomas v. District of Columbia,* 887 F.Supp. 1, 4 (D.D.C.1995) (quoting *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). In *Thomas,* it was alleged that a corrections officer forcibly touched or attempted to touch the plaintiff's penis on at least two occasions and otherwise sexually harassed and intimidated the plaintiff. The Court held:

> Sexual assault, coercion and harassment of the sort alleged by plaintiff violate contemporary standards of decency and can cause severe physical and psychological harm. *See Women Prisoners of the District of Columbia Dep't of Corrections v. D.C.,* 877 F.Supp. 634, 664–67 (D.D.C.1994); *see Jordan v. Gardner,* 986 F.2d 1521 (9th Cir. 1993). Unsolicited sexual touching, harassment, and coercion are "simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan,* 511 U.S. 825, ——, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident." *Hudson v. McMillian,* 503 U.S. at 9, 112 S.Ct. at 1000 (internal citations omitted). Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the harassment itself may also be sufficient evidence of a malicious and sadistic state of mind. *See Hudson v. McMillian,* 503 U.S. at 6–7, 112 S.Ct. at 998–99. That is the case here.

*Id.* at 4.

In *Watson v. Jones,* 980 F.2d 1165 (8th Cir.1992) allegations that a female corrections officer performed pat down searches of male inmates that consisted of "a deliberate examination of the genital, anus, lower stomach and thigh areas" was sufficient to set forth a viable Section 1983 course of action. In *Women Prisoners v. District of Columbia,* 877 F.Supp. 634 (D.D.C.1994), *vacated in part on other grounds,* 899 F.Supp. 659 (D.D.C.1995), among the findings made after a bench trial, was that there were sexual assaults on women prisoners including fondling, oral sex and rape. The Court concluded that these acts of sexual abuse constituted a "deprivation which amounts to a wanton and unnecessary infliction of pain ... which is so malicious that it violates contemporary standards of decency ... and simply not part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 664–65.

While the Court could not find a similar Second Circuit case, in *Branham v. Meachum,* 77 F.3d 626 (2d Cir.1996) it was held in an excessive physical force case, as in *Hudson,* that "the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 630 (quoting *Hudson, supra,* 503 U.S. at 7, 112 S.Ct. at 999); *see also Davidson v. Flynn,* 32 F.3d 27, 29 (2d Cir.1994).

 In this case, based upon the findings of fact stated above, the Court holds the defendant Roy Fries liable under 42 U.S.C. § 1983. The sexual abuse and sodomy perpetrated by the defendant, as Director of Security of the prison, against the powerless inmate was applied maliciously and sadistically in order to afford personal gratification to Fries. These malicious acts violated all contemporary standards of decency. Further, the Court finds that these acts of sexual abuse were a competing producing cause of physical and emotional injury.

 Finally, in regard to the Section 1983 cause, the Court notes that, in his answer the defendant raised certain defenses sounding in the nature of qualified immunity. The Court need not spend much time with the consideration of the qualified immunity defense. An official like Sergeant Fries would be entitled to qualified immunity from a civil damages claim for a constitutional violation asserted against him in his personal capacity unless his conduct violates "clearly established statutory or constitutional rights

of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), or even where the rights were clearly established, if it was objectively reasonable for him to believe that his actions did not violate that right. *Anderson v. Creighton,* 483 U.S. 635, 638–39, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987). Under *Harlow,* this reasonableness determination requires an objective analysis. Thus, the appropriate inquiry is whether under an objective analysis a reasonable person would conclude that the defendant's actions violated clearly established law or were objectively unreasonable. *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985).

■ In this case, the Court concludes that Sergeant Fries is not entitled to immunity from the plaintiff's claims against him in his individual capacity. Fries intentionally, deliberately and sadistically sexually abused an inmate and committed sodomy on him while he was handcuffed. The Court finds that any reasonable prison Director of Security knew that to try to force unwanted and prohibited sexual acts on a powerless inmate is objectively unreasonable and in violation of the inmate's rights. *See, e.g., Jemmott v. Coughlin,* 85 F.3d 61, 67–68 (2d Cir.1996); *Hathaway v. Coughlin,* 37 F.3d 63, 69 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Wright v. Smith,* 21 F.3d 496, 500–01 (2d Cir.1994); *Zavaro v. Coughlin,* 970 F.2d 1148, 1153–54 (2d Cir.1992); *Thomas, supra,* 887 F.Supp. at 6. Sergeant Fries is not entitled to qualified immunity.

B. *The State Law Causes of Action*

■ Count two sounds in the state law cause of action for assault and battery. Count three alleges a cause of action for intentional infliction of emotional distress. On the merits, based on the findings of fact set forth above, the plaintiff has established each of these causes. Even the rarely applied intentional infliction of emotional distress cause of action, requiring proof of extreme and outrageous conduct, has been made out. *See Bender v. City of New York,* 78 F.3d 787, 790 (2d Cir.1996).

However, there is a major legal impediment to the viability of both of these state causes. The plaintiff did not serve a notice of claim on either Fries or the County of Suffolk. The plaintiff contends that the failure to serve a notice of claim does not vitiate his state law claims on two grounds. First, the doctrine of the "law of the case" is applicable in that in 1993 Judge Wexler permitted the plaintiff to amend his complaint to interpose the two state law causes of action. Second, the service of a notice of claim is not necessary in this case because the intentional wrongful acts in this case were not "committed while in the proper discharge of his (Fries) duties and within the scope of his employment" as required by General Municipal Law § 50–m.

■ The plaintiff's "law of the case" argument is easily determined. Judge Wexler granted the plaintiff leave to amend. In so doing he did not pass on the merits on the case. Fed.R.Civ.P. 15(a) specifies that "leave (to amend) shall be freely given when justice so requires." The Supreme Court has emphasized that amendment should generally be permitted. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Only "undue delay and futility of the amendment, among other factors, are reasons to deny leave." *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). To find that the amendment adding the state law claims was not futile is a far cry from a finding of legal sufficiency. Accordingly, the "law of the case" doctrine does not preclude the defendant from challenging the state law claims based on the failure to serve a notice of claim. The Court will now address this defense on the merits.

■ New York General Municipal Law § 50–e(1)(b) provides that service of a notice of claim upon an officer or employee of a public corporation shall not be a condition precedent to the commencement of action against the employee. However, if an action is commenced against such an employee, but not against the public corporation, "service of the notice of claim upon the public corporation shall be required only if the corporation has a statutory obligation to indemnify such

person under this chapter or any other provision of law." Accordingly, a notice of claim is a condition precedent to a suit against a public employee such as the defendant Fries, sued in his official capacity where there exists a statutory obligation on the part of the public corporation to indemnify the employee.

Suffolk County ("the County") is statutorily obligated to defend a peace officer, such as the defendant Fries, by the terms of N.Y.Gen.Mun.L. § 50–m, entitled "civil actions against police and peace officers of Suffolk County; defense and indemnification," which provides in pertinent part as follows:

> 1. Notwithstanding the provisions of any other general, special or local law, code or charter, Suffolk county, upon discretionary adoption of a local law, ordinance, resolution, rule or regulation, shall provide for the defense of any civil action ... brought against a duly appointed police or peace officer ... employed by the county of Suffolk, and shall indemnify and save harmless such officer from any judgment of a court of competent jurisdiction whenever such action ... is for damages, including punitive or exemplary damages, arising out of a negligent act or other tort of such officer committed while in the proper discharge of his duties and within the scope of his employment.

Further, whether a peace officer such as Fries is entitled to indemnification from the County of Suffolk is determined by the County. N.Y.Gen.Mun.L. § 50–m(2) provides as follows:

> [t]he determination of whether any such officer properly discharged his duties within the scope of his employment shall be made in a manner which shall be established by rules, regulations and procedures promulgated by the Suffolk County Executive and adopted by the Suffolk County Legislature.

The Suffolk County Legislature has adopted Resolution No. 872–84 which creates the "rules, regulations and procedures" set forth in Gen.Mun.L. § 50–m(2). This Resolution establishes a Peace Officer Indemnity Committee "to determine the issue of whether or not a peace officer was acting within the scope of his employment." The Resolution further provides that "Whenever the Committee has determined that a peace officer was acting within the scope of his employment, the County shall be responsible for the payment of all damages, including exemplary or punitive damages ... imposed against said peace officer by way of settlement or judgment."

■ In this case, acting in accordance with N.Y.Gen.Mun.L. § 50–m(2) and Resolution No. 872–84, the County had determined that Fries acted within the scope of his employment and granted him the right of indemnification, both as to compensatory and punitive damages. As a result, Suffolk County has a statutory obligation to defend Sergeant Fries, and, pursuant to Gen.Mun.L. § 50–e(1)(b), service of a notice of claim is required against the County. No notice of claim having been served by the plaintiff in this case, the two state law causes of action, comprising counts 2 and 3, are dismissed.

### III. FINDINGS—INJURIES AND DAMAGES

#### A. The Injuries

■ The plaintiff's mother, Shirley Mathie, who was a particularly credible witness, testified that, during the period at issue, she noticed a mark on her son's arm as a result of a suicide attempt by using a metal toothpaste tube. She also noticed other changes in her son after mid-March of 1990. Her son was more morose, hard to talk to, his hands trembled and he was depressed. In addition, he was short-fused, wasn't sleeping well, and looked "terrible." After March 1990, Mrs. Mathie noticed other changes in her son's demeanor in that he was fidgety, avoided talking to her, avoided eye contact and peered down at the table. She testified that these symptoms continued until Mathie was transferred to the prison facility upstate in November 1990. His depression levelled off in a "slow process." She states that, after the transfer, these conditions improved and "he was sleeping better." Mrs. Mathie further testified that her son still continues to

have certain symptoms including anxiety, and sleeping problems, including nightmares.

The plaintiff testified that as a result of the sexual acts perpetrated by the defendant, he suffered physical injuries in the nature of anal bleeding and a burning sensation in the anal area for about a week. In addition, the plaintiff stated that he suffered from insecurity, fear, feelings of being vulnerable and panic attacks, among other emotional symptoms. Mathie testified that, as a result of the sexual abuse by Fries, he trusts no one and is "very angry." He states that, as a result of his disclosures about Fries, he "was afraid of being killed" until he left the SCCF in August 1990. He testified that he very rarely sleeps through the night and has "wild dreams." This sleeping problem has persisted to the present date. He also finds it very difficult to concentrate. These emotional problems somewhat subsided after he was transferred to state prisons upstate. Mathie felt better when he began taking college courses in prison in January 1992. While the Court has doubts concerning the plaintiff's alleged suicide attempt and the causal relation between the suicide attempt and the acts of sexual abuse by Fries, the Court accepts his testimony that, as a homosexual, he became more distrustful of men. The Court also credits the following testimony by Mathie:

Q. How did you feel at the time you were handcuffed to the pipes and subbed (sic) to sodomy?

A. Afraid for my life.

Q. Did you have any other feelings?

A. Humiliation, embarrassment.

(Tr. at 309).

As a follow-up to these incidents of sexual abuse, the Court notes that there were constructive events in the plaintiff's life during his period of incarceration. Mathie received his high school GED while at the SCCF. In State prison he attended college courses and received an Associate's Degree.

Mary Filou, the senior psychiatric social worker and the Administrator of Mental Health at the SCCF testified that she noticed a change in the plaintiff after he revealed the sexual abuse. She observed that he was fearful, depressed, and had a high level of anxiety. Prior to these occurrences, Mathie "did not show much anxiety," while after the incidents his level of anxiety was "quite high." In addition, Filou testified that the plaintiff showed symptoms of post-traumatic stress syndrome, although she did not record that diagnosis. Some time later, she reported this situation to Dr. Richard Dackow, a psychologist employed by the Suffolk County Probation Department.

Filou received the plaintiff's New York State mental health records, including the medical records at the Shawangunk Correctional Facility (Plaintiff's Exh. 7). These records reveal that Mathie repeatedly referred to the sexual abuse by Fries. The records show that he complained of panic attacks, "daily flashbacks re sexual assaults," insomnia, nightmares, "symptoms of anxiety," and being "anxious and apprehensive." On March 24, 1994, a diagnosis was made of Post–Traumatic Stress Disorder.

Dr. Richard Dackow, a clinical psychologist working in the SCCF, met the plaintiff several times because he was in special housing. He also met the plaintiff with Mary Filou on one occasion. He spent enough time with Mathie to make a "cursory impression." In his opinion, Mathie was suffering from a post-traumatic stress syndrome, and, in addition, had an anti-social personality disorder. In particular, the plaintiff complained about problems sleeping and had "intrusive thoughts." He claimed that he was assaulted by Sergeant Fries and he was "fearful." Asked about his "cursory impression" that the plaintiff was suffering from a post-traumatic stress syndrome, Dr. Dackow replied:

Q Now, what was the basis for your conclusion that Maurice Mathie was experiencing post-traumatic stress disorder?

MR. CABBLE: Objection. Asked and answered.

THE COURT: Overruled.

A His statements were that he was having problems sleeping, problems with what are called intrusive thoughts, the memory of a traumatic event recurring.

Q And you concluded that he indeed was experiencing that syndrome?

A He had the symptoms—what he reported to me was consistent with that syndrome.

Q Was it your professional opinion that he had that syndrome?

A I didn't do a full evaluation, as I prefaced my remarks to the Judge. It was just a diagnostic impression. He was being treated, so I didn't go—you know, I didn't do a full evaluation. But what he said was consistent with that syndrome.

(Tr. at 564–565).

In addition, Robert Dumond, the licensed mental health counselor and an expert in treating victims of sexual abuse, testified by deposition that Mathie is suffering from depression and fear of reprisals. He stated that when he interviewed the plaintiff he showed symptoms of anxiety and tension. Mathie complained of difficulty sleeping, nightmares and feelings of guilt. Also, Dumond concluded that "the alleged sexual assaults upon this patient are the proximate cause of Mr. Mathie's Post–Traumatic Stress Disorder."

The Court notes that the defendant produced no expert on the issue of the plaintiff's injuries. As stated above, Dr. Treacy limited her testimony to an attempt to discredit Dumond's findings and an explanation of a person with an anti-social personality disorder. She expressly declined to offer any diagnosis of Mathie's condition nor did she testify that he was not suffering from a post-traumatic stress disorder.

The emotional distress suffered by the plaintiff was apparently intensive and pervasive. The Court notes that, while the plaintiff was interviewed by Sergeant Totten of Internal Affairs several months after the incident, he "broke down and cried" on two occasions while relating what happened to him.

In the evaluation of the emotional distress sustained by the plaintiff as a direct result of the wrongful conduct by Fries, the Court finds that a part of the mental distress suffered by the plaintiff was caused by other factors. Shirley Mathie, the mother of the plaintiff and a registered nurse, testified that the plaintiff was depressed after his arrest for the period from August 1989 to January 1990. She testified that he was so depressed as a result of the murder charge, that he attempted suicide. The Court finds that prior to and unrelated to the sexual abuse, the plaintiff was depressed, fearful and angry and suffered from other symptoms of emotional distress, as a result of the murder charge lodged against him. It was as a result of these symptoms that Mathie first started seeing Mary Filou, the prison psychiatric social worker in 1989. Asked what event upset her son more, the homicide or the sexual abuse, Mrs. Mathie testified candidly "I could say it would be equal." (Tr. at 212).

The Court finds that a substantial part of the plaintiff's emotional problems, such as anxiety, depression and inability to sleep were a result of his participation in a brutal murder, his conviction for this crime, and the sentence he was serving as a result of that serious crime. In the determination of the monetary damages to be awarded to the plaintiff for the considerable emotional distress sustained as a result of the sexual abuse, the Court must be careful not to compensate the plaintiff for the non-related distress.

The Court finds the plaintiff proved, by a preponderance of the credible evidence, that he sustained the following injuries: (1) a physical injury to the anal area causing pain and bleeding for a short period of time; and (2) a post-traumatic distress disorder, with accompanying symptomatology including depression, anxiety, fear, and disturbed sleep, to the present date.

B. *The Damages*

(1) *Compensatory Damages*

As stated above, in this case there are two categories of compensatory damages, the physical injury to the anal area and the emotional distress resulting from the sexual abuse and anal sodomy. The measure of damages for pain and suffering and emotional distress is fair and reasonable compensation to be fixed by the trier of fact in the light of all the evidence in the case. Unlike pecuniary losses, these damages are, by their nature, not susceptible to mathematical com-

putation. Consequently, the law does not provide a precise formula by which pain and suffering and emotional distress may be properly measured and reduced to monetary value. The Court is assisted in this endeavor by reviewing the precedents, both in the area of emotional distress and sexual abuse.

More than ten years ago the Appellate Division, First Department affirmed a jury verdict awarding the plaintiff, who was arrested and assaulted after a minor automobile mishap, the sum of $250,000 for battery and $750,000 for malicious prosecution when the plaintiff appeared in court no more than six times and was never incarcerated. *See Vitale v. Hagan,* 132 A.D.2d 468, 517 N.Y.S.2d 725 (1st Dep't 1987). mod. on other grounds, 71 N.Y.2d 955, 528 N.Y.S.2d 823, 524 N.E.2d 144 (1988). In *Keefe v. Gimbel's,* 124 Misc.2d 658, 478 N.Y.S.2d 745 (N.Y. City Civ.Ct.1984), a woman who was stopped and questioned in a department store, was awarded compensatory damages in the sum of $100,000. In a false arrest–malicious prosecution case, the plaintiff was arrested, handcuffed, dragged through the department store and held in custody for approximately eight hours, sustained an injury to the jaw and emotional distress. A compensatory damage award in the total sum of $300,000 was reduced on appeal to $200,000. *See Gardner v. Federated Department Stores,* 717 F.Supp. 136 (S.D.N.Y.1989) *aff'd in part, rev'd in part* 907 F.2d 1348 (2d Cir.1990).

Other false arrest cases involving emotional distress include *Malte v. State of New York,* 125 A.D.2d 958, 510 N.Y.S.2d 353 (4th Dep't 1986) (mem.) ($125,000 reduced to $35,000 for teacher falsely arrested at school, strip searched and incarcerated ten hours) *appeal denied* 69 N.Y.2d 607, 514 N.Y.S.2d 1024, 507 N.E.2d 320 (1987) and *Orndorff v. De Nooyer Chevrolet, Inc.,* 117 A.D.2d 365, 503 N.Y.S.2d 444 (3d Dep't 1986) (affirming $50,000 for false arrest where plaintiff held in custody for 12 hours and ridiculed in a newspaper).

A major damage case in the Second Circuit is *Ismail v. Cohen,* 899 F.2d 183 (2d Cir. 1990), in which the plaintiff was involved in a minor parking dispute, was arrested, spent 60 hours in jail and sustained head trauma, two displaced vertebrae, and a cracked rib. A compensatory damage award of $650,000 was reinstated. In so doing the Court commented on damages for mental distress as follows:

> With respect to mental distress damages, we have been willing to uphold substantial awards where warranted. *Hughes v. Patrolmen's Benevolent Ass'n,* 850 F.2d 876, 883 (2d Cir.) ($225,000 in emotional distress damages in light of concerted harassment was not excessive even though no permanent harm resulted), *cert. denied,* 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988).

*Id.* at 187.

*Bert v. Port Authority of New York and New Jersey,* 166 A.D.2d 351, 561 N.Y.S.2d 416 (1st Dep't 1990) involved an incident with racial overtones in which the plaintiff was detained for three and one-half hours. A compensatory damage verdict of $318,000 was reduced to $100,000. In arguing for a further reduction of damages, the Port Authority cited the brief duration of detention, the lack of any claim for lost earnings, and the absence of any substantial mental or physical injury. In rejecting these arguments, the Court held:

> These arguments, however, completely ignore what is manifestly the most significant aspect of plaintiff's damage claims, *i.e.,* the abject humiliation to which he was subjected in the presence of young and impressionable members of his family and the strain the incident has imposed upon his relationship with his step-daughter. As plaintiff testified, "It's not the same anymore. We can't even go out the way we used to." Janet testified that after the incident she and her father "started to ... pull apart, ... we didn't go out as much; and when we did go out, we wouldn't—like he wouldn't hold my hand, you know. It wasn't as close as it was."
>
> We affirm.

*Bert,* 561 N.Y.S.2d at 417.

In *Lowrance v. Coughlin,* 862 F.Supp. 1090 (S.D.N.Y.1994), an inmate was subjected to repeated transfers, searches, placement in segregative confinement and medical de-

privations. After a bench trial the plaintiff was awarded compensatory damages in the sum of $132,000. *Id.* at 1120. In an unreported case, *Ramos–Poggie v. Century 21,* N.Y.L.J. Sept. 20, 1994 (S.D.N.Y.1994), a plaintiff was arrested in a department store after she struck a guard with an umbrella. She was held overnight and the charges were ultimately dismissed. The jury rendered a verdict for compensatory damages in the sum of $102,000. Recently, in *Bender v. City of New York,* 78 F.3d 787 (2d Cir.1996), the plaintiff had an altercation with the police during a protest, was forcibly arrested and detained for 29½ hours. All charges were subsequently dismissed without a trial. The plaintiff's claim was largely for emotional distress. The jury verdict in the sum of $300,700 was reduced on appeal to $150,000. *Id.* at 798.

With regard to compensatory damages in cases involving sexual abuse, there are few reported cases. In *Laurie Marie M. v. Jeffrey T.M.,* 159 A.D.2d 52, 559 N.Y.S.2d 336 (2d Dep't 1990), *aff'd,* 77 N.Y.2d 981, 571 N.Y.S.2d 907, 575 N.E.2d 393 (1991), a woman who was sexually touched by her stepfather when she was a child was awarded $100,000 in compensatory damages. In *Deborah S. v. Diorio,* 153 Misc.2d 708, 583 N.Y.S.2d 872 (Civ.Ct.N.Y.Co.1992) modified on other grounds, 160 Misc.2d 210, 612 N.Y.S.2d 542 (App. Term 1st Dep't 1994) a victim of acquaintance rape was awarded $170,445 in compensatory damages. In an unreported New Jersey Superior Court case, the plaintiff was sexually harassed by touching her breasts and other parts of her body. The jury returned a compensatory award of $450,000. *See P.A. Officer Awarded $450,000 in Bias Case,* Newark Star–Ledger, July 22, 1995.

In *Cornwell v. Robinson,* 23 F.3d 694 (2d Cir.1994), a combined Section 1983 and Title VII case involving sexual harassment in the nature of verbal abuse, some physical abuse and loss of earnings, a jury verdict for compensatory damages in the total sum of $230,-000 was reduced to $175,000 by a dismissal of parties, not with regard to the amount.

*Phillip v. Goulbourne,* N.Y.L.J. August 4, 1995 (Sup.Ct. West Co.1995) (not otherwise reported) involved three children who were raped and sodomized by their mother's fiancé. The children were suffering from post-traumatic stress disorder, defined as "stressful events outside the realm of normal human experience." In language appropriate to this case, the Court held that "compensatory damages are recoverable for sexual assault and intentional infliction of mental distress, for the injury itself, and for conscious pain and suffering including mental and emotional anxiety.... Among the many factors that the Court may consider and evaluate in assessing the appropriateness of an award of damages for a sexual assault are the social and emotional betrayal, humiliation and isolation suffered by the victim as well as the threat to the victim's self-esteem and physical, psychic and emotional integrity and health, in addition to actual therapeutic and medical expenses." Applying these principles and the significant factor of the egregious nature of the acts committed, the Court awarded compensatory damages of $500,000 to each plaintiff. Finally, in this review, considering the horror of a forcible rape in a state university dormitory, a compensatory damage award of $400,000 was affirmed in 1985 in *Miller v. State of New York,* 110 A.D.2d 627, 487 N.Y.S.2d 115 (2d Dep't 1985).

The Court has considered the evidence and exhibits as well as the legal principles set forth above. Included in this determination is the finding that a part of the emotional distress suffered by the plaintiff was caused by his participation in a murder for which he is incarcerated and not the violation of law in this case for which condition he cannot recover. Based on the totality of the evidence and the findings set forth above, the Court awards compensatory damages to the plaintiff Maurice J. Mathie in the total sum of $250,000.

### (2) *Punitive Damages*

 The Court now turns to the issue of punitive damages. There is no doubt that the egregious, wanton and malicious nature of the acts committed by Fries warrant the award of punitive damages. Fries used his position of Chief of Security at the Riverhead Jail to victimize and forcibly sodomize an inmate under his total control in an outra-

geous abuse of power and authority. These acts constituted an intentional violation of Mathie's constitutional rights. The purpose of punitive damages is to punish the defendant and to deter him and others from similar conduct in the future. *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 21, 111 S.Ct. 1032, 1045, 113 L.Ed.2d 1 (1991); *Vasbinder v. Scott,* 976 F.2d 118 (2d Cir.1992).

There are numerous Section 1983 cases in which punitive damages have been awarded and affirmed. Among these cases are *O'Neill v. Krzeminski,* 839 F.2d 9, 13 (2d Cir.1988) (a $185,000 punitive award assessed against police officers who beat the plaintiff about the face while handcuffed, even though there was no criminal prosecution or permanent physical or emotional injury); and *Hughes v. Patrolmen's Benevolent Ass'n,* 850 F.2d 876, 883 (2d Cir.) (concerted harassment and vendetta against the plaintiff merited a punitive award of $350,000), *cert. denied* 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988). *See also Papa v. City of New York,* 194 A.D.2d 527, 598 N.Y.S.2d 558 (2d Dep't 1993) *leave to appeal denied* 82 N.Y.2d 918, 610 N.Y.S.2d 146, 632 N.E.2d 457 (1994) (assault, battery, false arrest, malicious prosecution including being handcuffed to a pipe, punitive award reduced on appeal to $500,-000).

The sexual abuse cases awarding punitive damages include *Deborah S. v. Diorio, supra,* ($200,000 awarded in an acquaintance rape case); *Laurie Marie M. v. Jeffrey T. M., supra,* ($275,000 reduced to $100,000 in a sexual touching case); *Weeks v. Baker and McKenzie,* 1994 WL 774633 (Superior Ct. of California 1994) (in a case involving sexual harassment and touching, a $6,900,000 punitive damage verdict reduced to $3,500,000); and *Phillip v. Goulbourne, supra,* ($500,000 punitive damages awarded to each child in case of sexual abuse, rape and sodomy of two young children).

As stated above, the County of Suffolk will indemnify the defendant as to compensatory and punitive damages. Accordingly, the Court need not analyze the impact of the award with regard to the defendant's personal finances.

Having considered the totality of the evidence, the principles of law set forth above, and the need to punish the defendant and to deter others from committing such outrageous acts to a powerless inmate, the Court assesses punitive damages against the defendant Roy Fries in the sum of $500,000.

For the reasons set forth above, the Clerk of the Court is directed to enter judgment in favor of the plaintiff Maurice J. Mathie against the defendant Roy Fries individually and in his former official capacity as Sergeant of Security in the Suffolk County Correctional facility in the sum of $250,000 for compensatory damages and $500,000 for punitive damages, in the total sum of $750,000.

SO ORDERED: